**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 30, 2009

Charles R. Fulbruge III
Clerk

No.08-20081

MARIA ONTIVEROS, INDIVIDUALLY, AND
AS NEXT FRIEND OF MODESTO ONTIVEROS,
DECEASED; MARTHA DURAN; MODESTO
ONTIVEROS JR.; and ERIKA ZAMORA

Plaintiffs-Appellants

v.

CITY OF ROSENBERG, TEXAS;
ROBERT GRACIA, CHIEF OF POLICE; and
DEWAYNE LOGAN, OFFICER

Defendants-Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, Chief Judge, and, STEWART[*] and SOUTHWICK, Circuit
Judges.

EDITH H. JONES, Chief Judge:

On Sunday, October 17, 2004, police officer Logan fatally shot Modesto
Ontiveros while executing a warrant for his arrest. The plaintiffs, surviving
family members, brought the current action under 42 U.S.C. § 1983, asserting

---

[*] Judge Stewart concurs in the judgment only.

that Logan used excessive force and that his actions were ratified by the City when it reinstated and later promoted him to lieutenant. In a detailed and well-reasoned opinion, the district court granted summary judgment in favor of Lt. Logan and the City, finding that Lt. Logan had not used excessive force, that the officer was alternatively entitled to qualified immunity, and that the City was not liable. Because the Appellants have failed to raise a genuine issue of material fact surrounding the events in question, we affirm.

## I. BACKGROUND

In light of the district court's thorough opinion, only a sketch of the relevant evidence is necessary here. On the night of October 16, 2004, Ontiveros instigated a fight with James and Joel Arellano, friends of Glafiro Rodriguez. After being struck by the Arellanos, Ontiveros left the fight, warning that he would come back with a gun to kill the Arellanos. The next morning, Ontiveros went to the house shared by Rodriguez and the Arellanos, kicked in the door, and yelled that he was going to kill the Arellanos. When Rodriguez came outside, Ontiveros hit him in the head with a revolver, put the gun against his ribcage, and pistol-whipped him in the face. Ontiveros left again while repeating his threat to come back to kill the Arellanos.

Ontiveros returned home and test-fired his rifle. He and his friend Francisco Lara went back to Rodriguez's home where they found Rodriquez, the Arellanos, and other men outside. Ontiveros had both guns and a bottle of whiskey. He again threatened to kill the Arellanos. He handed the rifle to Lara who also pointed it at the men. After these threats, Ontiveros and Lara got back into their van and left.

Rodriguez and the Arellanos reported these threats to the police. After a magistrate issued felony warrants for Ontiveros and Lara, Chief of Police Robert Gracia classified the warrants as high risk because Ontiveros and Lara had been involved in a violent altercation earlier in the day, may have been drinking,

possessed and threatened to use a pistol and a rifle, and were believed capable of using the weapons. Gracia authorized a SWAT team to serve the warrants. The team, including Logan, was briefed on the dangerous circumstances and was advised that the suspects may not speak English.

When the team arrived at Ontiveros's mobile home about 9 p.m., the door was ajar. Sergeant Seymour and Detective Slater were the first to approach the house and yelled, "Police," in English and Spanish. As they opened the front door, Seymour could see Lara and ordered him to come outside. Instead, Lara began to move down the hallway. Seymour immediately ordered the SWAT team, dressed in black uniforms with "POLICE" written in bold white letters on the front and back, to enter. Lara was detained in the hallway. Seymour observed someone close the door to the master bedroom. With only one light turned on in the mobile home, Seymour could see the silhouette of feet under the bedroom door.

Lt. Logan was the fourth member of the SWAT team to enter. He saw Lara had been detained and was then informed by Seymour that someone was in the master bedroom. Seymour told Logan to kick down the door to the bedroom. When it did not open, Seymour instructed Lt. Logan to kick it again. Both men believed that Ontiveros was blocking the door. Lt. Logan believed that he kicked the door at least three times before it opened slightly.

When the door opened, Lt. Logan illuminated Ontiveros with the tactical light on his pistol and saw him a few feet away holding an object over his head. Ontiveros moved behind the door. Lt. Logan yelled, "Let me see your hands," several times in English and continued to view Ontiveros only by glancing around the door with his tactical light. Logan then believed he saw Ontiveros reaching into a boot at chest level for what Logan believed could be a weapon. At that point, Logan fired two shots. The dispatch record shows that an officer called in "shots fired" at 9:07:24 p.m.—approximately 8 seconds after the SWAT

team entered the house. A subsequent search of the bedroom revealed no weapons.

Ontiveros was transported to Hermann Hospital where he died from a gunshot wound. The autopsy report showed that one bullet entered Ontiveros's left arm and chest at an angle indicating that he was leaning forward at the waist or kneeling when shot.

After placing Logan on administrative leave, the Rosenberg Police Department Internal Affairs Unit, Texas Ranger Jeff Cook, and a Fort Bend County grand jury investigated the shooting. The grand jury did not indict Logan, and Ranger Cook found no fault on Logan's part. As a result, Chief Gracia allowed Logan to return to work and later promoted him to his current rank.

Ontiveros's survivors brought the current action, seeking damages under 42 U.S.C. § 1983. They alleged that Lt. Logan used excessive force when he shot Ontiveros and that the City of Rosenberg ratified this conduct by reinstating and promoting Logan. They have appealed from the district court's adverse summary judgment.

## II. DISCUSSION

We review *de novo* the district court's grant of summary judgment, using the same standards as the district court and considering whether there is any genuine issue of material fact that requires resolution by a jury. *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007). When a defendant pleads qualified immunity as an affirmative defense and moves for summary judgment on that basis, a court must decide (1) whether the facts alleged or shown by the plaintiff made out a violation of a constitutional right, and (2) whether that right was "clearly established" at the time of the defendant's alleged misconduct. Qualified immunity is applicable unless the defendant's conduct violated a clearly established constitutional right. To negate a defense of qualified immunity and

4

avoid summary judgment, the plaintiff need not present "absolute proof," but must offer more than "mere allegations." *Reese v. Anderson*, 926 F.2d 494, 499 (5th Cir. 1991).

For several years, the Supreme Court required that the first of these criteria—whether plaintiffs' facts allege a constitutional violation—must be decided at the outset. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001). Recently, however, the Court reversed course, holding that "courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808 (2009). The district court's decision, rendered before *Pearson*, principally addressed the merits question whether Lt. Logan's use of deadly force was unconstitutional. We see no reason, post-*Pearson*, to alter that approach here.

To prevail on their excessive force claim, the plaintiffs must establish "(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Freeman* at 416 (quoting *Tarver v City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)). An officer's use of deadly force is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others. *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003). The reasonableness of the use of deadly force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). It is a question of objective reasonableness "in light of the facts and circumstances confronting

[the officer], without regard to [the officer's] underlying intent or motivation." *Id.*[1]

Although other members of the SWAT team partially corroborated Lt. Logan's version of events, Lt. Logan is the only witness to those events immediately surrounding the shooting. In light of this, Appellants ask us to consider "circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *O'Bert ex rel. O'Bert v. Vargo*, 331 F.3d 29, 38-40 (2d Cir. 2003). Even so, we agree with the district court that the force used by Lt. Logan, when viewed from the officer's perspective, in light of the evidence before the court, was not clearly unreasonable.

The Appellants rest the majority of their argument on the short time frame covering the events in question, the location of Ontiveros's boots, and the position of Ontiveros's body when he was shot. None of these facts is disputed by the Appellees, yet none contradicts Lt. Logan's testimony. Instead, Appellants are attempting to use these undisputed facts to imply a speculative scenario that has no factual support.

---

[1] Even if the plaintiffs established that the officer used excessive force (and thus performed an unreasonable seizure under the Fourth Amendment), the court would perform an entirely separate inquiry applying a different reasonableness standard. In order to evaluate the "clearly established law" prong of the qualified immunity test, the court must ask whether, at the time of the incident, the law clearly established that such conduct would violate the right. This inquiry focuses not on the general standard—when may an officer use deadly force against a suspect?—but on the specific circumstances of the incident—could an officer have reasonably interpreted the law to conclude that the perceived threat posed by the suspect was sufficient to justify deadly force? *Brosseau v. Haugen*, 543 U.S. 194, 199–200, 125 S. Ct. 596 (2004).

Excessive force incidents are highly fact-specific and without cases squarely on point, officers receive the protection of qualified immunity. *Id.* at 201; *see also Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034 (1987) ("[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." (internal quotation omitted)).

Appellants most forcefully assert that no factfinder could reasonably believe that all of Logan's self-described conduct happened in eight seconds before Ontiveros was shot. Although Ranger Cook testified on the basis of his investigation that it would have been "close," he also said that it was "very possible that it could have happened in eight seconds." Logan's recounting of discrete actions he took in leading up to the shooting, including the number of times he peeked around the door to see Ontiveros and the number of times he called for Ontiveros to show his hands, is corroborated by the other officers who were present. Notably, Appellants provide no evidence to support their skepticism, and "at the summary judgment stage, we require evidence—not absolute proof, but not mere allegations either." *Reese v. Anderson*, 926 F.2d 494, 499 (5th Cir. 1991).

Appellants also point to what they believe is evidence of a cover-up—the location of Ontiveros's boots after the shooting. Lt. Logan stated that he searched the room after the shooting and found a single boot, which Ontiveros had been holding. A different officer who entered the room later believed that he saw a pair of boots. Someone else found a second, bloody boot in a closet across the room from where Ontiveros was shot. Appellants construe this evidence to suggest that Ontiveros was actually trying to put on his boots at the time he was shot and that Lt. Logan moved the second boot to make his version of the story more reasonable. Again, Appellants offer no evidence that the boot was moved as part of a cover-up rather than an effort to facilitate emergency medical treatment at the scene.

In any event, the presence of a second boot does not make Lt. Logan's actions less reasonable or trustworthy. Appellants do not argue that a second boot contradicts that Ontiveros: went into the bedroom after Lara was detained; appeared to be blocking the door; moved out of Lt. Logan's sight when the door was kicked open; and appeared to be reaching into a boot. These are the facts

that Logan faced when he made the split-second decision to use deadly force. At most, the presence of a second boot may support a theory that Ontiveros merely was trying to put his boots on as the police descended on the mobile home, but hindsight and speculation create no genuine, material fact issue as to how a reasonable officer could have interpreted Ontiveros's actions.[2]

---

[2] Ranger Cook starkly explained the exigency confronting Logan:

If Lieutenant Logan perceived Mr. Ontiveros's actions as Mr. Ontiveros putting his hand inside the boot do you think it would have been necessary for Lieutenant Logan to wait until Mr. Ontiveros exhibited a weapon before taking defensive action?

A. Absolutely not.

Q. And why not?
A. Because he will then be behind the curve on reacting. Action is always - - action always beats reaction.

Page 88
Q. If Mr. Ontiveros had a handgun in this boot, would there be any threat to Lieutenant Logan by Mr. Ontiveros just leaving his hand in the boot?
A. Absolutely.

Q. And why so?
A. Because you can shoot through a boot. If Mr. Ontiveros had a weapon, a gun in the boot, he could simply fire through the boot at Officer Logan.

Q. And do you think that it's likely that Lieutenant Logan would have had enough time to take appropriate steps to protect himself if he waited until Mr. Ontiveros removed a handgun from the boot if he had had one in there?
A. No. Once again, action beats reaction. If someone pulls a gun - - I don't know if you want me to go into that or not but —

Q. Explain that for us.
A. Action is going to beat reaction every time.

8

Finally, Appellants contend that the autopsy report demonstrates that when Ontiveros was shot, he was either bent over, with his hands raised in apparent surrender as he attempted to get on the ground in front of the officer, or he was already on his knees. Neither Logan nor the City of Rosenberg disputes that the bullet trajectory shows Ontiveros was leaning forward at the time he was shot. As the district court noted, "even if Ontiveros was leaning

---

For example, if I have - - if I have a gun and my brain - - I have made the decision to shoot, then that message is going to travel down to my muscles and I'm going to shoot. For you to react to that - - I have already started a process. You have to recognize it, then your brain has to tell your muscles to react, and then you're reacting to my actions. So action is going to beat

Page 89
reaction simply because of the cognitive element involved.

Q. Have you observed a training exercise where one training officer stands across a room from an officer, for example, and the training officer has his hand down next to his body with a gun in it and then the other officer is supposed to react? Have you seen that kind of training exercise?
A. I actually participated in that training about three weeks ago.

Q. Can you explain that in detail, how that training section works?
A. Well, we had simunition guns. I don't know if I need to explain, but it's guns that look and feel real but they don't shoot real bullets. And literally, I stood there and pointed a gun at the instructor and the instructor had the gun actually pointed to the ground and just told me to shoot whenever he acted. And I could not shoot him before he shot me. At best, I could tie him. He could bring the gun up, pull the trigger before I could pull the trigger. I never beat him, and at best I could tie him.

Q. Is a tie good enough in this work?
A. No, a tie, you die, you know.

forward . . . a reasonable officer could have interpreted the totality of his actions as a refusal to comply with orders." The autopsy report does not contradict the corroborated evidence of Ontiveros's actions or Lt. Logan's statement that Ontiveros appeared to be reaching into the boot out of the officer's line of sight.

The issues raised by the Appellants do not create the kind of genuine dispute that can overcome summary judgment in excessive force cases involving police shootings. The cases to which Appellants point are easily distinguished. In *Bazan v. Hidalgo County*, 246 F.3d 481 (5th Cir. 2001), for instance, witness testimony differed from the officer's, and the use of force was explained by events for which corroborating evidence should have been available. In *Pineda v. City of Houston*, 124 F.Supp. 2d 1037, 1055 (S.D. Tex. 1999), the autopsy and bloodstain analysis contradicted the officer's version of events. Appellants here, unlike in those cases, offer only their own conjecture arising from undisputed facts that do not materially contradict Lt. Logan's testimony.

To the contrary, this court has upheld the use of deadly force where a suspect moved out of the officer's line of sight and could have reasonably been interpreted as reaching for a weapon. *See Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991) (refusing to find excessive force where the suspect repeatedly refused to keep hands raised and appeared to be reaching for an object); *Young v. City of Killeen*, 775 F.2d 1349 (5th Cir. 1985) (upholding the use of deadly force when the suspect refused instructions to exit the vehicle and reached down to the floorboard). Given this, we agree with the district court that "an officer could have reasonably believed that Ontiveros posed a threat of serious physical harm to himself or other officers" and that Lt. Logan's actions were reasonable under the circumstances as he described them.

Because we hold that Lt. Logan did not violate Ontiveros's constitutional rights, we need not determine whether Lt. Logan would have had qualified

immunity or whether the City of Rosenberg would have been liable had Lt. Logan's use of force violated the Fourth Amendment.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED.**