# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-20799
Summary Calendar

United States Court of Appeals
Fifth Circuit

**FILED**
July 20, 2017

Lyle W. Cayce
Clerk

SHIRLEY FRANCIS, Individually and as Representative of the Estate of Gerrit Perkins and Bridget Neriz,

      Plaintiff - Appellant

v.

SHERIFF ADRIAN GARCIA; DEPUTY CHARLES MULBAH GBUNBLEE; DEPUTY BASILO JOSEPH REYES; DEPUTY W. R. MENDEZ; HARRIS COUNTY,

      Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:14-CV-2943

Before DAVIS, SOUTHWICK, and HIGGINSON, Circuit Judges.

PER CURIAM:*

Shirley Francis and Bridget Neriz sued Sheriff Adrian Garcia, Deputies Charles GBunblee, Basilo Reyes, W.R. Mendez, and Harris County, Texas, alleging violations of 42 U.S.C. § 1983. The defendants filed motions for summary judgment, which the district court granted. We AFFIRM.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-20799

FACTUAL AND PROCEDURAL BACKGROUND

On September 21, 2012, Bridget Neriz called the Harris County Sheriff's Office to report domestic violence.  She claimed her boyfriend, Garrit Perkins, pushed her to the floor, held a knife to her throat, and choked her with his other hand.  Perkins allegedly struck Neriz in the face with the flat edge of the knife.  He then lifted her from the floor and carried her into the master bedroom in a headlock.  In the bedroom, Perkins retrieved a handgun from the bedside table, dragged Neriz into the closet, and threatened to kill her and then himself.

Deputy Charles GBunblee was dispatched to the residence on Analisa Circle in Houston.  After taking Neriz's statement, GBunblee relayed the account to a Harris County Assistant District Attorney, who agreed to accept the charge of aggravated assault with a deadly weapon against Perkins.  GBunblee then sought an arrest warrant for Perkins, which "was issued and assigned for execution to the Harris County Gulf Coast Violent Offenders Task Force[.]"

The Task Force established surveillance on the residence with no results.  Eventually, the Task Force developed an anonymous source who agreed to notify police if he saw Perkins entering the home.  Around 8:00 p.m. on October 17, 2012, the anonymous source called police to report that Perkins arrived at the home in a silver SUV with a handicap license plate.  The Task Force then notified Deputy GBunblee and asked him to execute the arrest warrant.  GBunblee received permission from his supervisor to execute the warrant but was instructed to take additional deputies with him and not to force entry into the home.

GBunblee then called Deputies Basilo Reyes and W.R. Mendez, who accompanied him to the residence.  Beforehand, GBunblee checked the Harris County Judicial Information Management System and confirmed the warrant

2

against Perkins was still valid. GBunblee briefed Reyes and Mendez by showing them Perkins's photograph and providing a description of his earlier domestic-violence offense. He warned "them that Perkins was over six feet tall, weighed at least 250 pounds, and may be armed."

GBunblee and the other deputies parked their patrol cars a block away from the home so Perkins would not become aware of their approach. The deputies saw the silver SUV in the driveway; its hood was warm as if Perkins had recently arrived. The deputies, wearing their standard-issue uniforms, knocked on the door but received no response. Deputies Reyes and Mendez retreated to their cars, but GBunblee lingered to ask a neighbor about Perkins's whereabouts. During their conversation, GBunblee saw Neriz exit her home and place something in the trash can. He then radioed Reyes and Mendez to return and approached Neriz to ask if Perkins was inside the home. She replied, "No." After further questioning, the defendants claim Neriz "agreed that the deputies could come inside[.]"

The deputies drew their weapons before entering the home. Reyes and Mendez searched the second floor, while GBunblee remained downstairs to search the kitchen and living areas. Before entering the downstairs master bedroom, GBunblee instructed Neriz to stay in the common area. Upon entering the room, GBunblee announced his presence but received no answer. He used his flashlight to increase visibility, as the television generated the only light in the room. GBunblee then searched the bedroom to no avail before entering the dark master bathroom.

Once inside the bathroom, GBunblee attempted to open a walk-in closet but "could feel a large object holding the door closed." He announced himself multiple times before pushing the door ajar. Using his flashlight, GBunblee "saw Perkins kneeling, crouching, or squatting on the floor with his back to GBunblee and his arms and hands in front of his body." GBunblee ordered

Perkins to put his hands above his head.  Without complying, Perkins stood quickly and began to turn toward GBunblee.  At that point, GBunblee saw a black object approximately the size of a handgun in Perkins's left hand. GBunblee fired his weapon, hitting Perkins in the right side of his back.  The object in Perkins's hand was a cordless telephone.

Reyes and Mendez went downstairs after hearing the shots.  Reyes requested medical assistance for Perkins.  At that time, Neriz entered the master bedroom and failed to comply with Reyes's orders to get on the ground. As a result, Reyes forced her to the ground, handcuffed her, and escorted her to a parked patrol vehicle.  Perkins was transported to a local hospital, where he died.

Nariz and Shirley Francis, acting in their individual and representative capacities, sued Harris County, Sheriff Adrian Garcia, and Deputies GBunblee, Reyes, and Mendez.  They alleged violations of 42 U.S.C. § 1983, specifically complaining of Fourth, Fifth, and Fourteenth Amendment violations.  The defendants moved for summary judgment based on qualified immunity.  The district court granted the motion and entered final judgment in favor of the defendants.  Francis and Neriz timely noticed this appeal.

## DISCUSSION

We review the district court's grant of summary judgment *de novo*, applying the same legal standard to the evidence as the district court did. *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir. 2003). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law[.]"  *Id.*

The moving party bears the initial burden of identifying the basis for its motion and the portions of the record that support it.  *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015).  Once that burden is satisfied, the nonmovant must "go beyond the pleadings and by her own affidavits . . . designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  We review the evidence in the light most favorable to the non-moving party, with all reasonable inferences from the evidence made in that party's favor.  *Nola Spice*, 783 F.3d at 536.

Section 1983 provides a cause of action against any person who deprives another of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  To make a sufficient claim, plaintiffs "must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law."  *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).  Plaintiffs "must identify defendants who were either personally involved in the constitutional violation or whose acts are causally connected to the constitutional violation alleged."  *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999).

Qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Once a defendant raises the defense of qualified immunity, the plaintiff bears the burden of showing the defense does not apply.  *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).  To do so, the plaintiff

must show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow*, 457 U.S. at 818). We have discretion to determine which step to address first. *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013). To negate the qualified-immunity defense, the plaintiff must offer proof beyond "mere allegations." *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009).

Francis and Neriz originally alleged the defendants were liable for numerous constitutional violations, including unreasonable search and seizure, unlawful arrest, and excessive force. They narrowed their allegations on appeal, complaining now about GBunblee's alleged use of excessive force.[1] To succeed on their excessive-force claim, the plaintiffs must establish "(1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *See Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007). If the officer reasonably believes the suspect poses a threat of serious harm, the use of deadly force is not excessive. *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009). In determining reasonableness, we make "allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Accordingly, we judge the officer's conduct based on "the circumstances confronting him, without the benefit of hindsight." *Manis*, 585 F.3d at 843.

---

[1] Francis and Neriz abandoned their unreasonable-search-and-seizure and unlawful-arrest claims by failing to brief them on appeal. *See Yohey v. Collins*, 985 F.2d 222, 224–25 (5th Cir. 1993).

No. 16-20799

The defendants concede that Perkins suffered injury as a result of GBunblee's use of deadly force. The remaining question, then, is whether GBunblee's use of such force was excessive and unreasonable.

The district court relied on a decision involving a man named Ontiveros and his friend, Lara, who were engaged in a violent altercation with three men. *Ontiveros*, 564 F.3d at 381. Ontiveros repeatedly threatened to kill two of the men while Lara pointed a gun at them. *Id.* The victims reported the incident to the police, and a magistrate judge issued felony arrest warrants for Ontiveros and Lara. *Id.* When police officers were assigned to serve the warrants, they were warned that Ontiveros and Lara were "involved in a violent altercation earlier in the day, may have been drinking, possessed and threatened to use a pistol and a rifle, and were believed capable of using the weapons." *Id.* During the search of Ontiveros's home, the police observed someone enter the master bedroom and close the door. *Id.* After several attempts to kick the door open, the police decided Ontiveros must be blocking the door. *Id.* They illuminated the room with their flashlights through a small opening and viewed Ontiveros by glancing around the door. *Id.* An officer who believed Ontiveros was reaching for a weapon fired two fatal shots. *Id.*

The district court granted summary judgment based on qualified immunity. *Id.* at 382, 385. Plaintiffs had attempted to show a genuine dispute of material fact by questioning the officer's credibility. *Id.* at 383. We found, though, that other officers were able to corroborate his version of events and that the plaintiffs had failed to produce evidence contradicting his testimony. *Id.* Next, the plaintiffs suggested that Ontiveros did not present a threat because the evidence showed he was kneeling at the time of his death. *Id.* at 385. Even if Ontiveros were kneeling, "a reasonable officer could have interpreted the totality of his actions as a refusal to comply with orders[,]" and

7

the evidence did not contradict the officer's account that Ontiveros appeared to be reaching for a weapon. *Id.* Qualified immunity was thus proper. *Id.*

Qualified immunity applies here also. As in *Ontiveros*, Deputy GBunblee was aware prior to the execution of the arrest warrant that Perkins may be armed. GBunblee had personally responded to the domestic-violence complaint the previous month and was aware that Perkins had threatened to kill his girlfriend with both a knife and a gun. GBunblee was also aware of Perkins's size, having warned Deputies Reyes and Mendez that Perkins was over six feet tall and weighed at least 250 pounds. Like Ontiveros, Perkins attempted to evade apprehension by blocking the door to the walk-in closet. GBunblee could see him through the small opening in the door with the assistance of his flashlight. After asking Perkins to comply by raising his hands, Perkins failed to do so. Instead, like Ontiveros, Perkins made a sudden movement that GBunblee interpreted as threatening conduct. Further, GBunblee saw a black object in Perkins's hand that was about the size of a handgun. Without the benefit of overhead light, then, it would be reasonable for GBunblee to assume that Perkins posed a threat. *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014).

The plaintiffs allege there are three factual disputes material to the qualified-immunity analysis. First, an expert testified, based on the trajectory of the gunshot, that Perkins's posture was non-threatening when he was shot. Second, GBunblee's testimony is not credible because it allegedly contradicts other evidence. Finally, GBunblee is an interested witness.

The expert's testimony about Perkins's posture at the time of his death is insufficient to create the kind of genuine dispute capable of overcoming summary judgment. *See Ontiveros*, 564 F.3d at 385. In *Ontiveros*, evidence suggested the victim was kneeling when he died, but we held a reasonable officer could have believed his noncompliance with commands and perceived

attempt to reach for a weapon posed a threat of serious harm. *Id.* Here, Perkins was originally kneeling in the closet with "his arms and hands in front of his body." GBunblee would have had no way to know whether Perkins possessed a weapon. Further, Perkins failed to comply with GBunblee's commands. Finally, regardless of Perkins's posture, GBunblee saw Perkins carrying a dark object approximately the size of a handgun. Based on "the circumstances confronting him," it would have been objectively reasonable for GBunblee to believe "that [Perkins] pose[d] a threat of serious harm to the officer or to others."[2] *See Manis*, 585 F.3d at 843.

The plaintiffs' argument about GBunblee's credibility is also unavailing. We have analyzed situations in which the shooting officer was the only witness to the events. *See Ontiveros*, 564 F.3d at 383–84. In one case, for example, we credited the officer's uncorroborated testimony because it did not contradict other evidence and the plaintiffs failed to introduce evidence creating a genuine fact issue. *Small ex rel. R.G. v. City of Alexandria*, 622 F. App'x 378, 382 (5th Cir. 2015). Likewise, GBunblee's testimony is uncontroverted, and the plaintiffs failed to introduce evidence to undermine it. We will not reverse the district court's grant of summary judgment based on "mere allegations." *See Ontiveros*, 564 F.3d at 382.

AFFIRMED.

---

[2] The defendants argue the plaintiffs misinterpreted the medical evidence, as it "suggests that the taller Perkins was standing fully upright and turning to his right when the much shorter GBunblee discharged his weapon." The expert's diagram of the gunshot's trajectory is subject to varying interpretations, though. The bullet did enter the lower back and travel upward toward the sternum, indicating one of two scenarios. First, as the defendants argue, the shorter GBunblee shot the taller Perkins after Perkins stood. Second, GBunblee shot Perkins's lower back as Perkins was kneeling forward. In any event, Perkins's posture does not impact the analysis as to whether GBunblee was objectively reasonable in his belief that Perkins posed a threat of harm.