# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
September 9, 2019

Lyle W. Cayce
Clerk

No. 18-30837

CLARENCE JOSEPH JASON,

   Plaintiff–Appellee,

v.

ROBERT TANNER, Warden, Rayburn Correctional Center; SHANE
LADNER, Lieutenant; BRADLEY PIERCE, Sergeant,

   Defendants–Appellants.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before SMITH, GRAVES, and WILLETT, Circuit Judges.

DON R. WILLETT, Circuit Judge:

Clarence Jason was struck by a fellow inmate on the back of the head with a yard tool that the prison issued to inmates. Jason sued four state officials under § 1983 for violating his Eighth Amendment rights, claiming deliberate indifference and failure to train. The officials asserted qualified immunity, but the district court granted it only to one official. The other three appeal that denial. We REVERSE and grant qualified immunity to all four officials.

I

Clarence Jason was an inmate at a Louisiana prison. The prison has an inmate yard that features a football field, a baseball field, and a basketball court. One day while Jason was on the yard, a fellow inmate struck him on the

No. 18-30837

back of the head with a sling blade. A sling blade is a manual weed-cutting tool consisting of a long wooden handle with a heavy (often hooked) steel blade at the end. The attacker had a sling blade in the first place because Sergeant Master Bradley Pierce had issued it to a third (and otherwise uninvolved) inmate as part of a program in which inmates tended the yard.

The prison issued a few sling blades each morning. To check out a sling blade, an inmate handed over his ID card. (An inmate relies on his ID for meals, attending educational programs, visitation privileges, and "virtually anything else" that requires leaving his unit. So, apparently, the exchange was a meaningful accounting measure.) Meanwhile, officers supervised the inmates by making periodic rounds in the yard.

Despite this ID-exchange protocol, one inmate with a sling blade abandoned his tool and wandered off. Before the supervising officer noticed, the attacker picked up the discarded blade and cracked Jason's skull from behind. The blow caused Jason "severe head trauma."

Right before this, Jason had gotten into an argument with his attacker. But other than that, Jason alleges no previous disputes with him. The prison discovered the attack when the supervising officer, Lt. Shane Ladner, came across a pool of blood and a broken sling blade while on patrol. At that point, Ladner radioed for help, and the officers nabbed the attacker.

All of this happened despite the prison's Tool Control Policy. The warden, Robert Tanner, testified that he and several other prison officials drafted the Tool Control Policy; that the policy is reviewed annually; and that the American Correctional Association found that the tool policy complied with its standards in every audit since 1993.

The Tool Control Policy instructs the prison on how to inventory and categorize various tools—like "restricted tools" and "compound maintenance tools." Jason seemed to imply in his brief that sling blades were restricted tools.

2

No. 18-30837

And the district court too determined that they were restricted tools. But according to the prison officers, "swing blades and other similar yard tools . . . (such as shovels, reel mowers, and hoes)" weren't classified as restricted. Presumably, they may have been classified as "compound maintenance tools."

In any event, under the policy, the prison stores yard tools in a locked storage room while they're not being used. The prison issued yard tools for two to three hours at a time. And the officers testified that, under the policy, they "received regular, ongoing training . . . to ensure the safety and security of the inmates."

As for monitoring the yard, Ladner and Pierce testified that

1. They both make rounds;
2. Two "dorm officers" "observe the yard through the dorm windows during their [dorm] rounds";
3. Several tower cameras at the fence line continually show yard activity;
4. The "Gate" officer has a line of sight "over the front portions of [the yard]"; and
5. So do "officers stationed at the gym, and the laundry, and the vo-tech building" as well as the Gate officer for another, nearby prison unit.

But none of these measures prevented this attack.

Going "at least as far back as 2007," there had been "no prior assaults by inmates with a yard tool at [the prison]." And "during the previous seven-year period, there [had] only been four incidents"—three with a broom and one with a mop.

## II

Jason filed a § 1983 suit asserting violations of his Eighth Amendment rights. He sued:

- Shane Ladner, Lieutenant at the prison;
- Bradley Pierce, Sergeant Master at the prison;

3

No. 18-30837

- Robert Tanner, Warden of the prison; and
- James LeBlanc, Secretary of the Louisiana Department of
  Public Safety and Corrections.

As to Ladner and Pierce, Jason claims they were deliberately indifferent to his safety. And as to Tanner and Bradley, Jason claims that they failed to properly train prison officers.

The defendants moved for summary judgment, asserting qualified immunity. The district court granted Secretary LeBlanc qualified immunity. But it denied qualified immunity to Ladner, Pierce, and Tanner.

For Ladner and Pierce, the district court found that they had subjective knowledge of the risk in handing out sling blades to inmates. The court also held that "even if Defendant Pierce and Defendant Ladner did not have subjective knowledge of the substantial and obvious risk posed by handing out potentially dangerous tools to inmates without appropriate supervision, the risk was so obvious that they should have known." And the court determined that they were deliberately indifferent because they did not show that a prison official "had a direct line of sight and was actually looking at all inmates while they used restricted tools" at all times.

For Tanner, the district court found that there was a material dispute about how many minutes of training Pierce and Ladner received; and so whether they were adequately trained. The district court held that this potential lack of training would've caused the attack because the officers "lacked basic knowledge about the [tool policy]." And finally, the court held that under the "single incident exception," there was a material dispute about whether Tanner's failure to train his officers was so "obviously likely to lead to an assault" that it constitutes deliberate indifference.

Ladner, Pierce, and Tanner appeal the denial of qualified immunity.

4

No. 18-30837

III

"The denial of a motion for summary judgment based on qualified immunity is immediately appealable notwithstanding that such denial was premised upon the existence of 'material issues of fact.'"[1] We have jurisdiction to review only the district court's legal analysis of qualified immunity.[2]

We review the denial of qualified immunity de novo.[3] In doing so, we assess the scope of established rights and the reasonableness of officer conduct.[4] Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5] In reviewing, we consider only "the scope of clearly established law and the objective reasonableness" of the defendant's acts (as determined by the district court).[6] As we've explained, we "can review the *materiality* of any factual disputes, but not their *genuineness*."[7]

Materiality challenges "contend[] that taking all the plaintiff's factual allegations as true no violation of a clearly established right was shown."[8] And we must view the facts in the light most favorable to the plaintiff.[9]

IV

As the Supreme Court explained in *Harlow*, government officials have a right to qualified immunity when carrying out their duties.[10] But that

---

[1] *Thompson v. Upshur Cty.*, 245 F.3d 447, 455 (5th Cir. 2001) (alteration omitted) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 3134 (1996)).

[2] *Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 552 (5th Cir. 1997).

[3] *Thompson*, 245 F.3d at 456.

[4] *Freeman v. Gores*, 483 F.3d 404, 410 (5th Cir. 2007).

[5] FED. R. CIV. P. 56(a).

[6] *Thompson*, 245 F.3d at 456.

[7] *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc) (emphasis in original) (quoting *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000)).

[8] *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 379 (5th Cir. 2005).

[9] *Southard*, 114 F.3d at 552.

[10] *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18 (1982).

immunity is not absolute. Plaintiffs can go to trial if they show that the official violated their clearly established right.[11] In other words, it's a two-prong test—(1) whether the official violated a right; and (2) whether that right was clearly established.

The constitutional right here is the Eighth Amendment's protection against cruel and unusual punishment. As the Supreme Court explained in *Farmer*[12] and as we reiterated in *Williams*, "prison officials have a duty to protect prisoners from violence at the hands of other prisoners."[13] For claims against officials who failed to adequately protect an inmate and who failed to train, there are different tests. But both largely turn on the existence of "deliberate indifference."

A

The Supreme Court's 1994 *Farmer* decision held that prison officials violate their duty to protect prisoners under the Eighth Amendment "only when two requirements are met."[14] First, as an objective matter, the deprivation or harm must be "sufficiently serious."[15] Second, the official must have been deliberately indifferent.[16]

The Supreme Court defined the first element—sufficient seriousness—as the "denial of the minimal civilized measure of life's necessities."[17] Jason sustained a serious head wound. So his injury meets the first requirement of the *Farmer* standard.

---

[11] *Id.*; *see also Hogan v. Cunningham*, 722 F.3d 725, 734 (5th Cir. 2013); *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009).

[12] *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

[13] *Williams v. Hampton*, 797 F.3d 276, 280 (5th Cir. 2015) (en banc) (quoting *Farmer*, 511 U.S. at 833).

[14] *Farmer*, 511 U.S. at 834.

[15] *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

[16] *Id.*

[17] *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

No. 18-30837

As for deliberate indifference, the Supreme Court defined it as when the official "knows of and disregards an excessive risk to inmate health or safety."[18] In other words, it's a subjective test. Elaborating, the Supreme Court explained: "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. This approach comports best with the text of the Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'"[19]

But the district court seemed to misapply the test. The court determined that Ladner and Pierce knew the risk. But the court failed to identify evidence indicating that they knew of a "substantial risk" that a fellow inmate would attack Jason. Ladner and Pierce acknowledged that there was *a risk* that an inmate could use a sling blade to attack someone. But there were measures in place to prevent that. A substantial risk requires more.

The district court next concluded that Ladner and Pierce disregarded that risk. The court's rationale? Ladner and Pierce couldn't prove that everyone who was supposed to keep watch in fact had a line of sight and actually watched the inmates—at all times. Plus, neither Ladner nor Pierce witnessed the assault. But that doesn't show disregard of a risk.

Ladner and Pierce's jobs were simply to keep track of the blades and to keep an eye on the prisoners while they made their rounds. Jason never alleged, and the district court never asserted, that Ladner and Pierce shirked their duties; that they handed out sling blades and then failed to do their

---

[18] *Id.* at 837.
[19] *Id.*

rounds. The sad reality is simply that, in this case, the prison's protocol wasn't enough to keep Jason safe.

Consider our 2015 en banc opinion *Williams*.[20] There, one of the prison guards—Hampton—failed to check that her block gun was loaded. It was supposed to contain a hard, nonlethal rubber slug. But it was empty. And after the relieving officer traded places with Hampton, prisoners escaped from their exercise pens, attacking fellow inmates who later sued.[21]

In its internal investigation, the prison found that Hampton violated her duties, thus threatening the safety of the prisoners and her fellow guards.[22] Even so, we still granted her qualified immunity. There was no evidence that Hampton knew the block gun was unloaded when she handed it to the relieving officer.[23] So she didn't realize there was "an excessive risk to inmate safety or that she disregarded such a risk."[24] And we also emphasized that there was "no evidence that any inmate had escaped from the exercise pens prior to the day of the attacks at issue."[25] In granting qualified immunity, we stressed that deliberate indifference "has its genesis in the cruel and unusual punishments clause of the Eighth Amendment."[26] Yet these "acts or omissions did not amount to punishment."[27]

Here, there was no evidence that Ladner and Pierce shirked their duties. No one alleges that they themselves did anything wrong. And even in *Williams*, when the defendant had made a mistake, that alone still wasn't enough to

---

[20] 797 F.3d at 278–80.
[21] *Id.*at 279–80.
[22] *Id.*at 286.
[23] *Id.* at 287.
[24] *Id.* at 288.
[25] *Id.* at 289.
[26] *Id.*
[27] *Id.*

No. 18-30837

defeat qualified immunity. What's more, there was no evidence that any inmate had ever before attacked a fellow inmate with a sling blade.

Admittedly, one might have reservations about the sensibility of giving inmates sling blades to begin with. But under our en banc decision in *Williams*, Ladner's and Pierce's alleged individual conduct doesn't rise to deliberate indifference. They should thus be immune from suit.

B

Turning to Tanner: Section 1983 liability for supervisory officials hinges on a three-part test, which we reiterated in our 2001 *Thompson* opinion.[28] First, the supervisor must've failed to train the officers involved. Second, that failure to train must've caused the violation of the plaintiff's rights. Third, the failure to train must've constituted deliberate indifference.[29]

The district court held that Tanner failed to adequately train his officers. The court held so because it found "that in 15 years, Defendant Pierce received only 15 minutes of documented training related to 'tools,' and Defendant Ladner, in 24 years of service, received 5.5 hours of 'tools' training, all prior to 2009." The appellants urge that our 2005 *Roberts* opinion cautioned that adequacy-of-training assessments should consider all training provided rather than be construed too narrowly.[30] We read *Roberts* differently, as focused on the training "in relation to the tasks the particular officers must perform."[31]

Even so, it wasn't the lack of *training* that *caused* the risk to Jason. Rather, it was the sufficiency of the overall protocol—having only two guards making rounds and relying on other guards peering out of windows. But that situation might have been a mere reality of the prison's budget.

---

[28] *Thompson*, 245 F.3d at 459.

[29] *Id.*

[30] *Roberts v. City of Shreveport*, 397 F.3d 287, 293–94 (5th Cir. 2005)).

[31] *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

No. 18-30837

Regardless, even if the district court were right about the first two requirements, its deliberate-indifference analysis runs aground. The deliberate-indifference requirement stems from the Supreme Court's ruling in *Monell* some 40 years ago, rejecting pure respondeat superior liability under § 1983.[32] It was only eight years ago that the Supreme Court, in *Connick*, fully elaborated on deliberate indifference. In the Court's words:

> "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cty.* [*v. Brown*, 520 U.S. 397, 410 (1997)]. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program.[33]

In *Connick*, the Supreme Court considered "whether a district attorney's office may be held liable under § 1983 for failure to train based on a single *Brady* violation."[34] The case had to do with a supposed armed robbery and murder. Despite convictions for both charges, Thompson (the plaintiff) was innocent. It was only after nearly two decades in prison—one month from execution—that Thompson's investigator discovered exculpatory evidence that the prosecution failed to turn over. The reviewing court vacated both of his convictions. And he sued the district attorney in his official capacity.[35]

The jury "found the district attorney's office liable for failing to train the prosecutors."[36] On appeal, Connick (the DA) insisted that it was wrong to find him "deliberately indifferent to an obvious need for more or different *Brady*

---

[32] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978).
[33] *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (alteration omitted).
[34] *Id.* at 54.
[35] *Id.*
[36] *Id.* at 57.

10

training because there was no evidence that he was aware of a pattern of similar *Brady* violations."[37] But we affirmed. And rehearing the case en banc, we again affirmed—this time with a down-the-middle, even split. The Supreme Court reversed.

The Supreme Court held that to "prove deliberate indifference, Thompson needed to show that Connick was on notice that, absent additional specified training, it was 'highly predictable' that the prosecutors in his office would be confounded by those gray areas and make incorrect *Brady* decisions as a result. In fact, Thompson had to show that it was *so* predictable that failing to train the prosecutors amounted to *conscious disregard* for defendants' *Brady* rights."[38] In other words, there needed to be a pattern of previous violations.[39]

Justice Scalia's concurrence elaborated on deliberate indifference. He explained that a "theory of deliberate indifference" which allowed liability despite "no pattern or practice of prior violations" would effectively "repeal the law of *Monell* in favor of the Law of Large Numbers."[40]

Here, there was no repeated pattern of violations. True, there had been three yard fights with brooms and one with a mop. Now there's been one with a yard tool. But prison fights are lamentably common. And three yard fights with brooms and one with a mop just aren't enough to constitute a pattern.

Besides, the Supreme Court in *Connick* required that only very similar violations could jointly form a pattern.[41] In that case, Thompson underscored that "during the ten years preceding his armed robbery trial, Louisiana courts had overturned four convictions because of *Brady* violations by prosecutors in

---

[37] *Id.* at 58.
[38] *Id.* at 71.
[39] *Id.*
[40] *Id.* at 73 (Scalia, J., concurring).
[41] *Connick*, 563 U.S. at 62.

Connick's office."[42] Yet those cases weren't similar enough for the Court. Similarly, four cleaning-tool incidents don't create a pattern of violation that should've put the prison on notice for a sling-blade incident.

That's why in our unreported 2013 *Walker* case, we held that even a repeated pattern of violence isn't by itself enough to prove deliberate indifference.[43] There, the warden put a prisoner in the same cell as a notoriously violent inmate. The violent inmate killed his new cellmate, and the dead cellmate's parents sued the prison for failure to train. Yet we held that the plaintiffs hadn't shown deliberate indifference because they couldn't prove it was the lack of training that caused the violation.[44]

Returning to the cleaning-tool incidents: Even if the district court was right on causation, there was no pattern of violations. When inmate-on-inmate violence is a week-to-week regularity, four broom-or-mop incidents over seven years might not reasonably sound the yard-tool alarm. After all, many prisoners have devised many creative ways to injure someone—shanks,[45] toothbrush shivs,[46] ruler shivs,[47] ladle shivs,[48] tightly-rolled-newspaper spears (successfully used to kill a guard in 1985),[49] or broken black binder clips.[50]

All of this isn't to say that prisons have no duty to ensure safety. Nor is it to say that prisoners don't deserve safety; or that it's impossible to keep them

---

[42] *Id.* at 63.

[43] *Walker v. Upshaw*, 515 F. App'x 334, 335 (5th Cir. 2013).

[44] *Id.* at 339–40.

[45] Ed Pilkington, *Seven Inmates Brutally Killed with Knives in South Carolina Prison Unrest*, GUARDIAN (Apr. 16, 2018), https://www.theguardian.com/us-news/2018/apr/16/7-inmates-dead-17-injured-south-carolina-prison-fight.

[46] Brent Rose, *The Many Insane Flavors of Improvised Prison Weapons*, GIZMODO (Oct. 25, 2011), https://gizmodo.com/the-many-insane-flavors-of-improvised-prison-weapons-5853104.

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.*

safe. No, that is all far from the truth. Rather, these makeshift-weapon examples merely demonstrate how prisons often face novel threats. It may well be impractical to take every single theoretically possible safety precaution.

Besides, there is an exception that will sometimes apply (though not here): single-incident liability as theorized in *City of Canton*.[51] That exception allows liability where a municipality "fail[ed] to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face."[52]

One recent Fifth Circuit case used this exception: *Littell*.[53] There, "$50 went missing during a sixth-grade choir class."[54] No one fessed up. So the assistant principal "took all twenty-two girls in the choir class to the female school nurse, who strip searched them, taking them one at a time into a bathroom, where she checked around the waistband of their panties, loosened their bras, and checked under their shirts."[55] The school district allegedly permitted "school officials to conduct invasive searches" of students. But it did so with no training whatsoever.[56]

We found that the facts "mirror[ed] *Canton*'s hypothetical in all material respects."[57] But here, there *was* training. There was also a monitoring system in place. Again, it just failed to prevent the attack. Put differently: square peg, round hole. *Littell* was about a supervisor who didn't train his subordinates; not even at all. Had he adequately trained them, they would've known not to

---

[51] 489 U.S. at 396 (O'Connor, J., concurring).

[52] *Id.*

[53] *Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 625 (5th Cir. 2018).

[54] *Id.* at 619.

[55] *Id.* at 620.

[56] *Id.*

[57] *Id.* at 625.

strip search young girls. Yet here, it's not so much about insufficient training. Instead, it's about insufficient protocol.

This was the first and only sling-blade attack in a presumably otherwise incident-free program. The prison had instituted safety measures against sling-blade misuse—albeit one that didn't prevent this attack. But the Supreme Court's caselaw and our caselaw emphasize that only inadequate training can establish vicarious liability. Not simply an inadequate protocol.

\* \* \*

In sum, we REVERSE the district court and grant all three appellants qualified immunity.