# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

June 27, 2018

Lyle W. Cayce
Clerk

No. 16-20717

———

BETTINA LITTELL, as parent and next friend of I.L., a minor; YVONNE BENAVIDES, as parent and next friend of A.B., a minor,

> Plaintiffs - Appellants

v.

HOUSTON INDEPENDENT SCHOOL DISTRICT,

> Defendant - Appellee

———

Appeal from the United States District Court
for the Southern District of Texas

———

Before SMITH, BARKSDALE, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

During a sixth-grade choir class, an assistant principal allegedly ordered a mass, suspicionless strip search of the underwear of twenty-two preteen girls. All agree the search violated the girls' constitutional rights under Texas and federal law. Even so, the district court dismissed the girls' lawsuit against the school district for failure to state a claim. We reverse.

## I

## A

For purposes of this appeal, we take as true the amended complaint's factual allegations. Those allegations describe how $50 went missing during a

No. 16-20717

sixth-grade choir class at Houston's public Lanier Middle School. Assistant Principal Verlinda Higgins was brought in to investigate. When no money turned up, the school police officer "suggested that girls like to hide things in their bras and panties." Higgins took all twenty-two girls in the choir class to the female school nurse, who strip searched them, taking them one at a time into a bathroom, where she "check[ed] around the waistband of [their] panties," loosened their bras, and checked "under their shirts." The girls "were made to lift their shirts so they were exposed from the shoulder to the waist." No parents were notified, despite the girls' requests. No money was found.

B

The Houston Independent School District allegedly permits its school officials to conduct invasive searches of students' persons—but provides no training as to how to do so legally. Instead, employees are left to rely on the school district's written search policy as set forth in three official school district documents attached to the amended complaint.

The first document, labeled "Legal Policy FNF," states in abstract terms the federal legal standard governing student searches. *See Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 375 (2009); *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985). It instructs that searches must be "reasonable," and that "[a] search is reasonable if it meets both of the following criteria":

> 1. The action is justified at the inception, i.e., the school official has reasonable grounds for suspecting that the search will uncover evidence of a rule violation or a criminal violation.
>
> 2. The scope of the search is reasonably related to the circumstances that justified the search in the first place, i.e., the measures adopted are reasonably related to the objectives of the search and are not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

2

No. 16-20717

Legal Policy FNF also provides citation to the Fourth Amendment of the U.S. Constitution, *New Jersey v. T.L.O.*, and a federal district court opinion from 1980 dealing with dog-sniff searches of cars. The document gives no further explanation or detail, however, as to what its two criteria mean, or how teachers and administrators can tell when they are met.[1]

A second document, titled "Regulation FNF2," sets forth certain implementing procedures. This document provides a simpler—and broader—rule for deciding when a search is proper:

> Students and their personal effects are subject to being searched by school officials, if a school official has reasonable cause to believe that the student is in possession of contraband. . . . If a school official has reasonable cause to believe that contraband is present, he or she may institute a search.

Regulation FNF2 further defines "contraband" as "all substances or materials, the presence of which are prohibited by Board policy or state law." And it briefly attempts to define the legal phrase "reasonable cause."[2]

---

[1] Legal Policy FNF also states that "[s]chool officials may search a student's outer clothing, pockets, or property by establishing reasonable cause or securing the student's voluntary consent." Given the reference to "outer clothing," this sentence could arguably be read to prohibit *all* strip searches, regardless of context. The school district, however, emphatically rejects that view. At oral argument, for example, the following exchange occurred:

> THE COURT: In the policy, where it says "school officials may search a student's outer clothing, pockets, or property by establishing reasonable cause or securing consent," why doesn't that policy explicitly tell these teachers they couldn't go beyond clothing, especially if they didn't have even reasonable cause?
> THE SCHOOL DISTRICT: Well, unfortunately, in this day and age, there needs to be some discretion by school administrators that would allow those types of searches to maintain the safety in our schools.

Oral Arg. at 35:44–36:15; *see also, e.g.*, *id.* at 20:33–20:45 (school district stating its position that the policy permits searches to go beyond outer clothing and pockets "under certain circumstances"). For purposes of this appeal, therefore, we do not construe Legal Policy FNF to categorically prohibit searches of students' underwear.

[2] Regulation FNF2 defines "reasonable cause" as follows:

No. 16-20717

The last relevant document is page four of the Student Code of Conduct. This document purports to "brief[ly] descri[be]" the school district's legal policies and regulations. Its summary of the student-search policy is further condensed:

> School officials are empowered to conduct reasonable searches of students and school property when there is reasonable cause to believe that students may be in possession of drugs, weapons, alcohol, or other materials ("contraband") in violation of school policy or state law. Students who bring contraband onto school grounds may be searched . . . .

Apart from inserting the quoted language into these three documents, the school district allegedly does nothing to apprise its employees of the standards that govern whether, when, and how public officials may constitutionally search a student's person and/or underwear.

C

In the wake of the mass strip search in this case, the school's principal issued a memo admonishing Higgins for "[r]equesting a search of the students' person[s] for items other than 'contraband.'" It is unclear why the principal did not consider stolen money to qualify as "contraband" under Regulation FNF2 and/or the Student Code of Conduct, given that theft is "prohibited by . . . state law." Regardless, the supposed lack of "contraband" appears to have been the principal's only concern; the memo never criticized the search for invading the

---

> Reasonable cause is the standard for a search on school property or at school-related events and is based on the school official's specific reasonable inferences which he or she is entitled to draw from the facts in light of the school official's experience. Specific reasonable inferences may be drawn from instances including but not limited to a tip from a reliable student, suspicious behavior that suggests that contra-band is present, a smell indicating the presence of contraband, or a bulge in a pocket, etc. Reasonable cause should not be based on a mere hunch.

underwear of twenty-two preteen girls, or for doing so without particularized suspicion.

The memo likewise made no mention of Legal Policy FNF or Regulation FNF2. Instead, it instructed Higgins to "follow [the school district's] policy and procedures in the Student Code of Conduct," and to "revisit page 4 of [that Code] for policy procedures concerning school officials and reasonable search of students." The memo further made clear that, at least in the principal's mind, such strip searches of students are not *per se* improper under school district policy. Rather than forbidding all strip searches going forward, the memo requested: "In the future, if you feel a student must have a search requiring a strip search, please notify me before proceeding."

D

Two of the girls' mothers sued the Houston Independent School District in federal district court on their daughters' behalves. They asserted claims under 42 U.S.C. § 1983 and the Texas Constitution. As relief, they sought compensatory damages, as well as an injunction requiring the school district to clarify its search policy and provide at least *some* Fourth Amendment training.

The school district moved to dismiss the complaint for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). While its motion was pending, the school district responded to Plaintiffs' first set of interrogatories, and in doing so provided copies of the documents described above. *See* Fed. R. Civ. P. 33(d). The district court subsequently granted the school district's motion and dismissed the complaint without prejudice.

Plaintiffs promptly amended their complaint, this time attaching copies of the school district's interrogatory responses and the documents the school

No. 16-20717

district had provided.[3] It was not enough. The district court granted the school district's renewed motion to dismiss the action under Rule 12(b)(6), while denying further leave to amend. This appeal followed.

## II

We review a district court's dismissal under Rule 12(b)(6) de novo, "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (en banc); *see also Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993) (no heightened pleading standard for municipal § 1983 liability). To survive a motion to dismiss, a complaint need not contain "detailed factual allegations"; rather, it need only allege facts sufficient to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Significantly, a complaint may proceed even if "recovery is very remote and unlikely," so long as the alleged facts "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56.

## III

The central issue on appeal is whether the amended complaint states a claim for municipal liability against the school district under 42 U.S.C. § 1983.

---

[3] Some of the school district's interrogatory responses differ from the facts alleged in the amended complaint. To the extent there are inconsistencies, our factual recitation above credits the amended complaint. *See, e.g.*, *Peña v. City of Rio Grande*, 879 F.3d 613, 620 & n.9 (5th Cir. 2018) (explaining that "on a motion to dismiss, [a plaintiff's] well-pleaded factual allegations enjoy a presumption of truth," even if they conflict with factual assertions made by other persons in documents attached to the amended complaint).

No. 16-20717

That statute makes liable "[e]very person" who, under color of state law, violates federal constitutional rights. For this purpose, municipal entities like the school district qualify as "persons." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). But the school district "cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* Rather, the school district *itself* must have caused the violation. *Id.*

Thus, to state a § 1983 claim against the school district, the amended complaint must allege sufficient factual content to permit the reasonable inference (1) that a constitutional violation occurred and (2) that an "official policy" attributable to the school district's policymakers (3) "was the moving force" behind it. *See, e.g.*, *Magee*, 675 F.3d at 854, 866–67; *see also, e.g.*, *Peña v. City of Rio Grande*, 879 F.3d 613, 621 (5th Cir. 2018); *Groden v. City of Dallas*, 826 F.3d 280, 283–85 (5th Cir. 2016). We address each component in turn.

A

That the alleged facts demonstrate a constitutional violation is presently undisputed. A brief discussion of *why* the alleged search was unconstitutional, however, will nonetheless prove helpful.

To search a student's person, school officials must generally have reasonable suspicion that the search will reveal evidence of a violation of school rules or the law. *T.L.O.*, 469 U.S. at 341–42; *accord Redding*, 557 U.S. at 375; 2 Wayne R. LaFave et al., *Criminal Procedure* § 3.9(k) (4th ed. updated Dec. 2017). Reasonable suspicion has two dimensions. One is the "knowledge component," which measures the strength of the evidence indicating illicit activity. *Redding*, 557 U.S. at 370–71. The second dimension, often called the "nexus" component,[4] measures the strength of the evidence indicating "that the specific

---

[4] *E.g.*, *United States v. Moore*, 805 F.3d 590, 594 (5th Cir. 2015); *United States v. Freeman*, 685 F.2d 942, 948–49 (5th Cir. 1982).

'things' to be searched for and seized are located on the property [or, in this context, the person] to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978); *accord Redding*, 557 U.S. at 370. Together, these elements mean that searching a student's person requires "a moderate chance of finding evidence of wrongdoing" on the person of that specific student. *Redding*, 557 U.S. at 371.

When the search is of the student's *underwear*, moreover, additional requirements apply. Underwear searches are "embarrassing, frightening, and humiliating." *Id.* at 374–75. "[B]oth subjective and reasonable societal expectations of personal privacy support the treatment of such a search as categorically distinct, requiring distinct elements of justification . . . ." *Id.* at 374; *see also Roe v. Tex. Dep't of Protective & Regulatory Servs.*, 299 F.3d 395, 404 (5th Cir. 2002) ("Strip searches implicate fundamental Fourth Amendment rights."). Thus, the Supreme Court has "ma[d]e it clear" that a search of a student's underwear is impermissibly intrusive unless the school officials reasonably suspect either that the object of the search is dangerous, or that it is actually likely to be hidden in the student's underwear. *Redding*, 557 U.S. at 377; *see, e.g.*, *id.* at 368, 374–76 (search requiring thirteen-year-old student to "pull[] her underwear away from her body" held impermissibly intrusive because no evidence suggested that the "common pain relievers" sought were either dangerous or likely to be found in the girl's underwear).

Applied here, this clearly established law means that Higgins violated the constitutional rights of the twenty-two girls unless Higgins reasonably suspected that the missing $50 cash (1) would be found on that particular girl's person and either (2) would be found specifically in that girl's underwear or (3) would pose a dangerous threat to students. For what are perhaps obvious reasons, the parties do not dispute that the alleged search failed all three conditions. It was clearly unconstitutional.

No. 16-20717

B

The parties' real dispute concerns whether Plaintiffs adequately allege an "official municipal policy" on which § 1983 liability may rest. *See Monell*, 436 U.S. at 691. To be clear, the argument is not that the school district's written search policies are facially unconstitutional or that they caused the alleged constitutional violation by themselves. Rather, the "official municipal policy" on which Plaintiffs attempt to hang *Monell* liability is the school district's alleged policy of providing *no training whatsoever* regarding its employees' legal duties not to conduct unreasonable searches. In other words, as currently presented, this is a "failure to train" case.

1

The Supreme Court established the "failure to train" method of proving municipal liability in *City of Canton v. Harris*, 489 U.S. 378, 386–92 (1989). Under *Canton*, when a municipal entity enacts a facially valid policy but fails to train its employees to implement it in a constitutional manner, that failure constitutes "official policy" that can support municipal liability if it "amounts to deliberate indifference." *Id.* at 388. To prove deliberate indifference at trial, Plaintiffs must show that, "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390.

*Canton* envisioned two means of proving deliberate indifference. Sometimes, *Canton* said, municipal employees will violate constitutional rights "so often" that the factfinder can infer from the pattern of violations that "the need for further training must have been plainly obvious to the . . . policymakers." *Id.* at 390 n.10. This proof-by-pattern method is "ordinarily necessary." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997).

No. 16-20717

But even absent proof of pattern, deliberate indifference can still be inferred if the factfinder determines that the risk of constitutional violations was or should have been an "obvious" or "highly predictable consequence" of the alleged training inadequacy. *Id.* (construing *Canton*, 489 U.S. at 390 & n.10); *accord Brown v. Bryan Cty.*, 219 F.3d 450, 459–61 (5th Cir. 2000) (same); *see also, e.g., Burge v. St. Tammany Par.*, 336 F.3d 363, 373 (5th Cir. 2003) ("[I]n a limited set of cases, a plaintiff, unable to show a pattern of constitutional violations, may establish deliberate indifference by 'showing a single incident with proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights,'" such that "it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy or failure to train.")*; Drake v. City of Haltom*, 106 F. App'x 897, 900 (5th Cir. 2004) (reversing grant of motion to dismiss because "[w]e [were] unwilling to say, at th[e pleading stage], that it is not obvious that male jailers who receive *no* training and who are left virtually unsupervised might abuse female detainees"). Such an inference is possible in only very narrow circumstances: The municipal entity must have "fail[ed] to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face." *Canton*, 489 U.S. at 396 (O'Connor, J., concurring); *accord Peña*, 879 F.3d at 624 (suggesting that, without proof of a pattern of constitutional violations, the failure to train generally must be "complete," rather than merely deficient in a particular narrow respect).[5]

---

[5] Because "virtually every" plaintiff alleging municipal liability can propose *some* training reform that would have prevented "the particular injury-causing conduct," *Canton*, 489 U.S. at 391–92, our caselaw has "generally reserved" the single-incident method of proving deliberate indifference for cases in which the policymaker provides "no training whatsoever" with respect to the relevant constitutional duty, *Peña*, 879 F.3d at 624, as opposed to training that is inadequate only as to the particular conduct that gave rise to the plaintiff's

No. 16-20717

Thus, for example, if a city policymaker opts to provide no training whatsoever to police officers concerning the established and recurring constitutional duty not to use excessive deadly force, a factfinder may reasonably infer that the city acted with the requisite deliberate indifference. The Supreme Court explained as much in *Canton*, by way of hypothetical:

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, *see Tennessee v. Garner*, 471 U.S. 1 (1985), can be said to be "so obvious[]" that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

489 U.S. at 390 n.10 (majority opinion). "Under those circumstances there is an obvious need for some form of training." *Connick v. Thompson*, 563 U.S. 51, 64 (2011). Otherwise, the Supreme Court has said, there would be "no way for novice officers to obtain the legal knowledge they require" to conform their behavior to their clear and recurring constitutional obligations. *Id.* at 63–64.

2

Here, the alleged facts, taken together and assumed to be true, permit the reasonable inference—i.e., the claim has facial plausibility—that the risk of public officials' conducting unconstitutional searches was or should have been a "highly predictable consequence" of the school district's decision to provide its staff no training regarding the Constitution's constraints on searches.

---

injury, *see, e.g.*, *Peterson v. City of Fort Worth*, 588 F.3d 838, 849 (5th Cir. 2009) (granting summary judgment because the city undisputedly provided "extensive training on the use of force," even if that training did not specifically address "the risk of injury from knee strikes"). *Accord Connick v. Thompson*, 563 U.S. 51, 67 (2011) (rejecting failure-to-train liability based on a single incident because the alleged training defect was too "nuance[d]").

Indeed, Plaintiffs' allegations mirror *Canton*'s hypothetical in all material respects.

As in *Canton*, "[t]he constitutional duty of the individual officer [not to conduct unreasonable searches] is clear," with ample "constitutional guideposts for municipalities." 489 U.S. at 396–97 (O'Connor, J., concurring) (construing *id.* at 390 & n.10 (majority opinion)). Although the *Canton* hypothetical concerned the Fourth Amendment's constraints on seizures, whereas this case concerns its constraints on searches, "the precise nature" of both types of obligations is sufficiently clear in the law. *Id.* at 397. Indeed, if anything, it is the duties with respect to *searches* that are defined with greater specificity. Student searches are governed by defined principles such as the need for individualized suspicion, the nexus requirement, and the limit on unduly intrusive means. Excessive force, on the other hand, turns on a totality-of-the-evidence balancing test that "requires careful attention to the facts and circumstances of each particular case" and "is not capable of precise definition or mechanical application." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Because excessive-force law is sufficiently clear to ground failure-to-train liability—as *Canton*'s hypothetical makes plain—we hold the same with respect to the law of unreasonable student searches.

Also as in *Canton*, the constitutional duty not to conduct unreasonable searches is plausibly alleged to arise "in recurrent situations that a particular employee is certain to face." 489 U.S. at 396 (O'Connor, J., concurring) (construing *id.* at 390 & n.10 (majority opinion)). The alleged facts here fairly imply that conducting a "search" within the meaning of the Fourth Amendment (thereby triggering the constitutional duty) is among "the usual and recurring" tasks that at least some school district employees "must perform." *Id.* at 390–91 (majority opinion). Most notably, the school district expressly vests search authority in *all* its "school officials," and notifies its students that their persons

"may be searched." *See supra* Part I–B. And with respect to Higgins herself, the alleged fact that she "was brought in . . . to investigate," *supra* Part I–A, coupled with the disciplinary memo's anticipation that she might order additional strip searches "[i]n the future," *see supra* Part I–C, makes plausible that the school district expected, or even intended, that Higgins would exercise her authority to order students searched. These factual allegations must suffice at the pleading stage to show that the school district knew or should have known to a high degree of certainty that Higgins and other employees would be placed in situations requiring knowledge of Fourth Amendment search law.

Like the city in *Canton*, moreover, the school district cannot rely on its employees to come pre-equipped with legal knowledge. Just as "[t]here is no reason to assume police academy applicants are familiar with the constitutional constraints on the use of deadly force," *Connick*, 563 U.S. at 64, there is no reason to expect that school district employees automatically understand the constitutional constraints on searching a student's person. After all, public school officials are generally no better equipped than police officers "to find, interpret, and apply legal principles." *Id.* at 70. To the extent the school district disagrees with this assessment, of course, it is free to present contrary evidence at summary judgment or at trial. But at the pleading stage, this unremarkable conclusion finds adequate support in both "experience and common sense," *Iqbal*, 556 U.S. at 679, and in the factual allegations that not one of Higgins, the school police officer, or the nurse realized the search might be unconstitutional, and that even the school's principal—who was tasked with disciplining Higgins for conducting an unlawful search—*still* failed to diagnose the search's serious constitutional defects, *compare supra* Part I–C, *with supra* Part III–A. The amended complaint thus plausibly alleges that, "in the absence of training, there is no way for [school officials] to obtain the legal knowledge they require." *Connick*, 563 U.S. at 64.

In these circumstances, the Supreme Court has said, "there is an obvious need for *some* form of training." *Id.* (emphasis added). But, critically, the school district here allegedly provides "no training whatsoever" as to how to conduct a lawful search. *Peña*, 879 F.3d at 624. This straightforward factual allegation carries straightforward doctrinal consequences. It means that, for purposes of resolving the school district's motion to dismiss, we must assume that this is *not* a case in which "an otherwise sound [training] program has occasionally been negligently administered," or in which an officer received appropriate training that she then failed properly to obey. *See Canton*, 489 U.S. at 391; *Burge*, 336 F.3d at 373. Nor do Plaintiffs rely on only a "nuance[d]" flaw in an existing training regime, or attempt to derive municipal liability from the mere fact that "additional training would have been helpful." *Connick*, 563 U.S. at 67–68; *see supra* note 5. Instead, we must credit Plaintiffs' factual allegations and proceed on the assumption that the school district has made the conscious choice to take *no* affirmative steps to instruct *any* of its employees on the constitutional rules governing student searches—even though at least some of those employees are regularly called upon to conduct such searches. In short, this case presents an alleged "*complete failure to train*" of the kind we have found actionable. *Peña*, 879 F.3d at 624. Plaintiffs' allegations of deliberate indifference survive a motion to dismiss.

We emphasize, however, that our conclusion in no way ordains Plaintiffs' ultimate success. Without a pattern of constitutional violations, deliberate indifference can be inferred only in narrow and extreme circumstances like those of *Canton*'s hypothetical. And in the thirty years since *Canton* issued, *actual*

cases reaching those extremes have proved fortunately rare.[6] Perhaps at summary judgment or at trial, the evidence in this case, too, will reveal the allegations of deliberate indifference to have been unfounded. The evidence might show, for example, that no one reasonably expects school officials to conduct "searches" within the meaning of the Fourth Amendment. Or it might show that, contrary to Plaintiffs' allegations, the school district *does* provide legal search training to employees who might reasonably be expected to need it.

But if Plaintiffs' allegations prove true—that is, if the school district knew or should have known that officials like Higgins would certainly be placed in situations implicating Fourth Amendment search law; if the school district knew or should have known that those officials would lack the legal knowledge necessary to handle those situations; and if the school district nonetheless failed to provide those officials any legal training on the subject—then the factfinder will be entitled (but not required) to infer that the school district acted with deliberate indifference to its students' Fourth Amendment rights. In such a case, "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights c[an] justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right." *Brown*, 520 U.S. at 409 (construing *Canton*, 489 U.S. at 390 & n.10).

---

[6] We count only one published "single incident" failure-to-train case in our circuit in which the plaintiff prevailed. *See Brown*, 219 F.3d at 457–65 (upholding jury verdict). But conversely, we have identified just two published Fifth Circuit decisions dismissing such a claim on the pleadings. And those cases, unlike this one, did not involve allegations of a "complete failure to train." *Peña*, 879 F.3d at 624 (emphasis omitted); *accord Culbertson v. Lykos*, 790 F.3d 608, 625 (5th Cir. 2015); *see also, e.g.*, *Drake*, 106 F. App'x at 900 (reversing grant of motion to dismiss because "[w]e [were] unwilling to say, at th[e pleading stage], that it is not obvious that male jailers who receive *no* training and who are left virtually unsupervised might abuse female detainees").

No. 16-20717

Whether the evidence will bear that out, and whether that inference will prove persuasive, are factual matters incapable of resolution on a motion to dismiss.

3

The contrary arguments presented to us fail to engage the applicable legal framework. For example, the district court's analysis turns on its erroneous assumption that, without a pattern of unconstitutional searches, the school district could not have been on notice of the need to provide at least *some* type of Fourth Amendment training.[7] But in light of *Canton*, the Fifth Circuit recognizes an "exception" to the pattern method of proving deliberate indifference for cases in which "a constitutional violation was the highly predictable consequence" of the alleged failure to train. *E.g.*, *Burge*, 336 F.3d at 373. The district court never meaningfully evaluated whether that exception might apply here. And we conclude above that Plaintiffs plausibly allege it might.

The school district, meanwhile, devotes wide swaths of its brief to asserting the facial constitutionality of its written search policies. Because those policies correctly state the law, the school district says, unlawful searches could not have been an "obvious" consequence of enacting them. The first difficulty with this argument is its premise: in fact, the school district's written search

---

[7] The district court rejected the allegations of deliberate indifference because, in its view:

> Plaintiffs have failed to demonstrate that [school district] personnel are *recurrently faced with situations so similar to the facts of the instant case* that the need for training would be obvious. To be more specific, Plaintiffs did not provide the Court with any *prior instances when [school district] officials conducted a search of this magnitude* before the event of the instant case, nor do they allege there is a *pattern of complaints* by other citizens. Although the strip searches in this case may have been questionable under the Fourth Amendment, any impropriety of these searches was not a product of [the written search] policy, and *Plaintiffs have failed to establish a pattern of unconstitutional behavior* that should have led [the school district] to begin training its employees. (emphases added).

policies are at best incomplete guides to actual Fourth Amendment law, capturing none of the alleged search's constitutional defects. *Compare supra* Part I–B, *with supra* Part III–A. Although the policies describe the "knowledge component" of the reasonable suspicion standard (i.e., the requisite degree of certainty that contraband "[be] present"), they make no mention of the requirement that there be reasonable suspicion linking the contraband to a particular student. *See, e.g., supra* note 2. And the policies are wholly silent with respect to the additional requirements for strip searches, i.e., that there be reasonable suspicion that the object of the search will be found specifically in the student's underwear or else be dangerous. If anything, the policies say the opposite: they appear to condone the use of strip searches to locate any "contraband," defined as any item possessed in violation of the law or school policy.

But even accepting the school district's incorrect premise, this argument is still beside the point. The Supreme Court in *Canton* "reject[ed] [the] contention that only unconstitutional policies are actionable under [§ 1983]." 489 U.S. at 387. Instead, *Canton* permits municipal liability when "a *concededly valid* policy is *unconstitutionally applied*." *Id* (emphases added). In such a case, the "policy" that grounds municipal liability is the failure to train municipal employees regarding their constitutional duties, if that failure amounted to deliberate indifference and caused the plaintiff's injury. *Id.* at 387–88. Plaintiffs need not also demonstrate the invalidity of the written policies themselves.[8]

---

[8] The school district also places heavy reliance on the Eleventh Circuit's opinion in *Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160, 1173–75 (11th Cir. 2001), *cert. granted, judgment vacated*, 536 U.S. 953 (2002), *and opinion reinstated*, 323 F.3d 950 (11th Cir. 2003). But, tellingly, that case was decided not at the pleading stage but on a motion for summary judgment, with an evidentiary record inconsistent with Plaintiffs' factual allegations here. *See id.* at 1162–63, 1173 (affirming grant of summary judgment because "the students have failed to present sufficient evidence to demonstrate . . . that the District's employees faced clear questions of Fourth Amendment law on a recurring basis"); *see also Drake*, 106 F. App'x at 900 (reversing the district court for relying on an out-of-circuit single-incident case that "was decided on a motion for summary judgment, not a motion to dismiss"). In addition,

No. 16-20717

Only two portions of the school district's brief confront the *Canton* framework. Those portions assert that the risk of unconstitutional searches could not plausibly have been an "obvious consequence" of providing no Fourth Amendment training because (1) the missing $50 unambiguously fell outside the written policies' definition of "contraband" and (2) Fourth Amendment caselaw is not "void for vagueness." The relevance of the first point is unclear, but it is in any event incorrect. Because Texas law prohibits theft, *see* Tex. Penal Code Ann. § 31.03, the reportedly stolen $50 constituted both "materials . . . prohibited by . . . state law" within the meaning of Regulation FNF2, and "evidence of . . . a criminal violation" within the meaning of Legal Policy FNF. *See supra* Part I–B. And the school district's second point is a non sequitur. Nothing in *Canton* suggests that a legal doctrine must be "void for vagueness" before a municipality's failure to train its staff to follow it can ground a failure-to-train theory. Otherwise, there could be no *Canton* hypothetical. After all, police officers can always conduct *their own* research into excessive-force law, which (one assumes) is not void for vagueness either.

We hold that deliberate indifference is plausibly alleged.

C

Of course, deliberate indifference is not the whole story. Plaintiffs' "failure to train" theory will also require proof of causation: "Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *Canton*, 489 U.S. at 391. Without stating its reasoning, the district court held that, even if Plaintiffs adequately allege deliberate indifference, they still fail to allege causation. We hold otherwise.

---

*Thomas* lacks persuasive value to the extent it conflates the "pattern" and "single incident" methods of proving deliberate indifference. *See* 261 F.3d at 1173–74 (rejecting single-incident liability because the plaintiffs failed to adduce evidence of a pattern of unconstitutional searches). In the Fifth Circuit, we have explained, those two methods are distinct. *See, e.g.*, *Burge*, 336 F.3d at 373.

No. 16-20717

Given the relatively egregious nature of the alleged constitutional viola-tion in this case, *see supra* Part III–A, we think it plausible that even a modi-cum of Fourth Amendment training would have alerted Higgins that the search she ordered was unconstitutional. We also think it plausible that Hig-gins would not have undertaken the search had she known it was illegal. Thus, to the extent the amended complaint plausibly alleges deliberate indifference, it also plausibly alleges causation. We cannot affirm the district court's alter-native basis for dismissing Plaintiffs' federal claims. The order dismissing those federal claims must, accordingly, be reversed.

IV

In addition to asserting federal claims, Plaintiffs seek injunctive relief under article 1, section 9 of the Texas Constitution (which prohibits unreason-able searches). They ask the district court to order the school district to clarify its search policy and provide minimally adequate search training.

The parties and the district court have implicitly assumed throughout this litigation that Texas law recognizes an implied cause of action under which plaintiffs can sue to enjoin municipal policies that cause constitutional violations (e.g., a policy of failing to train), even if those policies are not *them-selves* unconstitutional. *Cf. City of Beaumont v. Bouillion*, 896 S.W.2d 143, 148–49 (Tex. 1995). Without passing judgment on the matter, we adopt that assumption for the limited purpose of this appeal.[9]

---

[9] *Bouillion*—the only Texas case cited by the parties or the district court—held that "there is no implied private right of action for damages arising under the free speech and free assembly sections of the Texas Constitution," 896 S.W.2d at 147, but stated that "suits for equitable remedies for violation of constitutional rights are not prohibited," *id.* at 149. This language does not obviously resolve whether the Texas Constitution contains an implied right of action to enjoin an inadequate municipal training policy that is not itself unconstitu-tional, as Plaintiffs seek to do here. (No one has argued that the alleged policy of providing no training itself violates the Texas Constitution.) Nonetheless, because "appellate courts do not sit as self-directed boards of legal inquiry and research," *NASA v. Nelson*, 562 U.S. 134, 147 n.10 (2011) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.)),

No. 16-20717

Even with that assumption in place, however, the district court dismissed Plaintiffs' Texas-law causes of action for failure to state a claim. It did so for two independent reasons, both of which were error.

A

First, the district court dismissed the Texas-law claims based on its previous determination that, under the standards of causation applicable to § 1983 suits for municipal liability, "Plaintiffs fail to allege sufficient facts to indicate that [the school district's allegedly] deficient training of its employees was the 'moving force' behind the constitutional violations."

We have already rejected the district court's conclusion on this point. In fact, we have held, Plaintiffs *do* allege sufficient factual content to permit the reasonable inference that, but for the alleged failure to train, the alleged constitutional violations would not have occurred. *See supra* Part III–C. And, to the extent the district court intended to rely on its conclusion that Plaintiffs fail adequately to allege deliberate indifference, we have rejected that conclusion, too. *See supra* Part III–B. This stated rationale from the district court cannot justify dismissing Plaintiffs' state-law claims.

B

Second, the district court dismissed the Texas-law claims because, in its view, "what Plaintiffs appear to be asking for is an 'obey-the-law' injunction," which the district court thought "would be too vague . . . to give a reasonable person notice" of what it would require. For support, the district court cited Rule 65(d) of the Federal Rules of Civil Procedure, which defines the required scope and content of district court injunctions. Under Rule 65(d), "[a] general

---

especially when it comes to delicate questions of state law, we decline to address in the first instance this nonjurisdictional issue that neither party raises. We instead join the parties and the district court and assume without deciding that a "failure to train" lawsuit is cognizable under the implied private right of action to enforce the Texas Bill of Rights.

injunction which in essence orders a defendant to obey the law is not permitted." *Meyer v. Brown & Root Const. Co.*, 661 F.2d 369, 373 (5th Cir. 1981).

We reverse this determination. As an initial matter, it is far from clear that Rule 65(d) can *ever* justify dismissing a cause of action at the pleading stage. Rule 65(d) governs the scope and content of injunctions; it does not purport to set a pleading standard. Neither the district court nor the school district cites any case suggesting that a complaint's failure to propose sufficiently specific injunction language is grounds for a Rule 12(b)(6) dismissal.[10]

To the extent Rule 65(d) can theoretically justify a pleading-stage dismissal, moreover, we expect that it can do so only if there is no conceivable way to frame the requested relief in adequately specific terms. That is not the case

---

[10] We find opinions from numerous district courts that address this issue, the majority of which agree that Rule 65(d) usually does not justify dismissal of a complaint. *See SEC. v. Couch*, No. 3:14-CV-1747-D, 2014 WL 7404127, at \*8 (N.D. Tex. Dec. 31, 2014) (refusing to dismiss a request for injunctive relief "based only on the allegations of the complaint" just because the request could be considered an "obey the law injunction" in "violat[ion] of Rule 65(d)(1)'s specificity requirements"); *City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296, 353–54 (E.D.N.Y. 2007) ("[A] motion for failure to state a claim properly addresses the cause of action alleged, not the remedy sought. It is the court that will craft any remedy. Only when that remedy has been determined may defendants contest its application on grounds of vagueness or some other violation of Rule 65(d) . . . ."); *Goodman v. Donald*, No. CIVA CV699012, 2007 WL 2164535, at \*9 (S.D. Ga. July 24, 2007) ("Defendants contend Plaintiff's requests for injunctive relief should be dismissed because they are vague based, in part, on Rule 65(d) . . . . It is clear Rule 65(d) is not implicated at this point in the litigation. This portion of Defendants' Motion to Dismiss is denied."); *Dasrath v. Cont'l Airlines, Inc.*, 228 F. Supp. 2d 531, 546 (D.N.J. 2002) (noting that while "an injunction might very well be impermissible under Rule 65(d)[,] . . . the specificity requirements of that rule are not applicable in assessing an attack on the complaint" (citing 11A Wright & Miller, *Federal Practice and Procedure* 2d § 2955 (1995))); *W. Colo. Fruit Growers Ass'n, Inc. v. Marshall*, 473 F. Supp. 693, 699–700 (D. Colo. 1979) (agreeing that the requested injunction might violate Rule 65(d) but explaining that "[t]he equitable nature of injunctive relief . . . renders such claims particularly unsuited for disposition in a motion to dismiss"); *U.S. ex rel. Clark v. Ga. Power Co.*, 301 F. Supp. 538, 543 (N.D. Ga. 1969) ("Rule 65(d), as indicated by its title, refers to the form of an injunction or a restraining order, and is silent as to the specificity required in the complaint's request for injunction."). *But see In re Xerox Corp. ERISA Litig.*, No. CIV. 3:02CV01138 AWT, 2008 WL 918539, at \*7 (D. Conn. Mar. 31, 2008); *In re Xerox Corp. ERISA Litig.*, 483 F. Supp. 2d 206, 221 (D. Conn. 2007).

here. Far from merely requesting that the school district be enjoined from violating the Fourth Amendment, the amended complaint seeks, in its words,

> injunctive relief . . . prohibiting the use of strip searches of students at [Houston Independent School District] schools unless and until:
>
> (1) The [written] Student Search Policy is clearly defined; including who can be searched, under what circumstances a student can be subjected to a search, what can be searched for, when a search is reasonable, and the procedures for implementing said search;
>
> (2) A procedure for implementing a search of a student's person is clearly documented, including but not limited to proper ways to obtain consent, who is to be notified and when they are to be notified that a search is occurring; and
>
> (3) [The school district] implements a training program for all employees so that student's Constitutional Rights are protected.

It is not difficult to imagine reforms to the school district's allegedly nonexistent Fourth Amendment training program that the district court could conceivably order without running afoul of Rule 65(d). To take some easy examples: the district court might order that the written policy be modified to mention the "nexus" requirement, *see Zurcher*, 436 U.S. at 556; *supra* Part III–A; or it might order that some type of in-person training occur at least once for certain classes of employees. The district court's characterization of Plaintiffs' requested relief as a mere "obey-the-law" injunction is incorrect.

This is not to say that the language in the amended complaint would pass muster if copied verbatim into an injunction. In the event that Plaintiffs demonstrate their entitlement to such an order (presumably after a trial), there will be opportunity for the parties and the court to resolve which particular requirements are justified by the established facts. But at the pleading

No. 16-20717

stage, the rule that injunctions must do more than "order the defendant to obey the law" cannot justify the dismissal the district court entered here.

## V

The district court's judgment is reversed. This case is remanded for further proceedings consistent with this opinion.