# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
March 29, 2021
Lyle W. Cayce
Clerk

No. 20-10344

VALERIE JACKSON,

*Plaintiff—Appellant*,

*versus*

LUPE VALDEZ; MARIAN BROWN; DALLAS COUNTY, TEXAS,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:18-CV-2935

Before BARKSDALE, SOUTHWICK, and GRAVES, *Circuit Judges*.
PER CURIAM:[*]

Valerie Jackson is a transgender woman who sued Dallas County, Texas, and its employees for violating her constitutional rights related to her gender identity. Pursuant to Federal Rule of Procedure 54(b), she appeals the district court's denial of her motion for recusal and the Rule 12(b)(6) dismissal of Dallas County and Sheriffs Lupe Valdez and Marian Brown in

---

[*] Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

No. 20-10344

their official capacities. We AFFIRM IN PART, REVERSE IN PART, and REMAND for further proceedings.

## I. Background

Because this is an appeal from a Rule 12(b)(6) dismissal, the following are allegations from the operative complaint.

Valerie Jackson is a transgender woman. She was assigned the sex of male at birth and had her gender legally changed to female prior to the events alleged in the instant case.

On or about November 4, 2016, Jackson was arrested for unlawful possession of a weapon and taken to the Dallas County jail. During booking, an officer asked her standard intake questions and gave her a wristband identifying her gender as female. She was taken to an enclosed corner and ordered to lift her shirt and bra to expose her bare breasts, to which she complied. She was then escorted to a nurse.

The nurse asked Jackson medical questions that led her to reveal that she was a transgender woman. The nurse left the paperwork the way it was filled out and concluded the medical assessment. When Jackson returned to the waiting area with the other female detainees, an officer asked her in front of the other detainees if she had "a sex change or something" and whether she "had everything done even down there." She answered yes so that the humiliation would end.

Jackson was taken to the same enclosed corner and instructed to pull down her pants and underwear. When she asked why, an officer stated: "We need to know if you've had a sex change or not. We need to see if you have a penis or vagina. We have to protect you. We can't put you with men if you have a vagina." Jackson said she was not going to pull down her pants, and the officer replied: "You are coming up in the system as male. It doesn't

matter what you do, it can never be changed." Jackson stated again that she was not going to pull down her pants and that she should not have to prove anything to them if none of the other women had to prove anything. The officer continued: "Now our policy is we have to verify that you've had a sex change. If you have a penis, you're going with the men. If you have a vagina, you're going with the women."

Jackson continued to insist that she did not want to pull her pants down. An officer told her that if she refused, they would transfer her to Parkland Hospital where she would have to show her genitals, thus adding hours to her incarceration. An officer also said: "That's our policy. You can talk to [Sheriff] Lupe Valdez about it when you get out." The officer explained that the process could not move forward without Jackson revealing her genitals. Feeling she had no other choice, Jackson complied with the strip search.

After the search, Jackson was eventually placed in her own cell. She was then taken in a line with male inmates to court, and when she returned to the jail, she was taken to the male locker room and instructed to strip down and shower because "it was something everyone had to do." An officer intervened and took her to a holding cell, where Jackson received a new wristband that identified her gender as male. Jackson was moved multiple times while waiting for her paperwork to be processed, each time encountering new officers and inmates who misidentified her gender.

After being released from custody, Jackson filed a formal complaint regarding her treatment in the Dallas County jail. On November 7, 2016, Captain Shelley Knight with the Dallas County Sheriff's Office was contacted by a local newspaper regarding Jackson's treatment. Knight informed the newspaper that there was an investigation on the incident and that the intake video from November 4, 2016, was pulled. She also informed

the newspaper that she could see where some of the policy was misconstrued and other parts were not followed.

On April 19, 2017, Jackson was arrested for the second time and taken to the Dallas County jail, where she was classified male and held with the male inmates. She asked the officers to contact Knight, who could explain that Jackson should be classified and placed with female inmates, but they refused. She was later forced to shower with male inmates.

On June 15, 2018, Jackson was arrested for the third time and taken to the Dallas County jail, where she was again classified male and held with the male inmates. She was again forced to shower with male inmates.

In November 2018, Jackson sued Dallas County, Texas; former Sheriff Lupe Valdez and current Sheriff Marian Brown in their official and individual capacities; and Officer Lizyamma Samuel, Officer Samuel Joseph, and Unknown Dallas County Employee III in their individual capacities under 42 U.S.C. § 1983 for violations of her Fourth, Fifth, and Fourteenth Amendment rights.

In September 2019, the case was transferred to Judge Brantley Starr. Jackson moved for recusal under 28 U.S.C. §§ 144 and 455(a), arguing that Judge Starr held a bias against members of the LGBTQ community. The motion was denied. On motion, the district court later dismissed Dallas County and Valdez and Brown in their official capacities under Rule 12(b)(6). Jackson timely appealed.

## II. Motion to Recuse

## A. Standard of Review

We review the denial of a motion to recuse for abuse of discretion. *Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 483 (5th Cir. 2003).

No. 20-10344

## B. Legal Analysis

Jackson argues that the district court erred in denying her motion to recuse because of his personal bias against members of the LGBTQ community. Specifically, in an affidavit attached to the motion, Jackson averred that prior to his appointment to the federal bench, Judge Starr advocated against equal rights for members of the LGBTQ community as a Deputy Attorney General for the State of Texas by challenging federal guidance that directed schools to permit transgender students to use bathrooms that align with their gender identity; defending the right of county clerks to refuse to issue marriage licenses to same-sex couples; and testifying about state legislation that would protect adoption agencies that refuse to place children with same-sex couples. Further, Jackson stated that the judge "refused" to answer questions regarding the legal treatment of LGBTQ people during his judicial confirmation process, and that he supported the judicial nomination of Jeffrey Mateer, who said that transgender children were part of "Satan's plan."

Section 144 aims exclusively at actual bias or prejudice. *Patterson*, 335 F.3d at 483. It requires a judge to recuse if a party to the proceeding "makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party." 28 U.S.C. § 144. The affidavit must "state the facts and the reasons for the belief that bias or prejudice exists" and "shall be accompanied by a certificate of counsel of record stating that it is made in good faith." *Id.* The judge must pass on the sufficiency of the affidavit but may not pass on the truth of the affidavit's allegations. *Patterson*, 335 F.3d at 483. A legally sufficient affidavit must: (1) state material facts with particularity; (2) state facts that, if true, would convince a reasonable person that a bias exists; and (3) state facts that show the bias is personal, as opposed to judicial, in nature. *Id.*

No. 20-10344

Section 455(a) deals not only with actual bias and other forms of partiality, but also with the appearance of partiality. It requires a judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). A party seeking such disqualification "must show that, if a reasonable man knew of all the circumstances, he would harbor doubts about the judge's impartiality." *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d 1404, 1408 (5th Cir. 1994) (internal quotation marks and citations omitted). The objective standard relies on the "well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person." *Andrade v. Chojnacki*, 338 F.3d 448, 455 (5th Cir. 2003) (internal quotation marks and citation omitted). "The review of a recusal order under § 455(a) is 'extremely fact intensive and fact bound,' thus a close recitation of the factual basis for the [party's] recusal motion is necessary." *Republic of Panama v. Am. Tobacco Co.*, 217 F.3d 343, 346 (5th Cir. 2000) (citation omitted).

We agree with Jackson that the district court improperly addressed the truth of her affidavit under section 144. In reviewing a section 144 motion, the district court must only pass on the sufficiency of the affidavit and not its truth. *Patterson*, 335 F.3d at 483. Judge Starr, however, expressly addressed the truth of Jackson's affidavit—claiming, *inter alia*, that Jackson "misconstrues the positions that this judge advocated on behalf of his client." Judge Starr then evaluated, contested, and corrected each section of Jackson's affidavit. Instead, the district court should have stopped with this statement: "Instead of demonstrating personal bias, Jackson's allegations are merely against the positions Texas advanced in litigation and state 'no specific facts that would suggest that this judge would be anything but impartial in deciding the case before him.'"

While we admonish the district court for addressing the truth of Jackson's affidavit, contrary to the directives of section 144, we nevertheless

6

conclude that it properly denied the recusal motion under both statutory provisions. Jackson did not state facts in her affidavit showing that the judge harbored an actual bias against Jackson under section 144 nor did she demonstrate that the judge's impartiality might reasonably be questioned under section 455(a). Jackson cited to examples of the judge's past legal advocacy in the course and scope of his employment for the State of Texas, during which the judge made statements reflecting solely the legal positions of his client, not his personal views. A lawyer often takes legal positions on behalf of his client that he may or may not personally agree with, and the statements made by Judge Starr when he was a Deputy Attorney General only involved pertinent legal issues; that is, they were interpretations of statutes, caselaw, and administrative rules and reflected no personal animus against LGBTQ people.

If the instant case involved the judge's former employer or the same exact issue, recusal could be warranted. *See* 28 U.S.C. § 455(b)(3) (requiring recusal where a judge previously served in governmental employment and expressed an opinion concerning the merits of the particular case in controversy); *Panama*, 217 F.3d at 347 (holding that the judge's name listed on motion to file an amicus brief asserting allegations against tobacco companies similar to the ones made in the instant case against the defendant tobacco company may lead a reasonable person to doubt his impartiality). But the district judge's prior participation in high-profile cases involving a group of people with which Jackson identifies, without more, is insufficient to support a finding of actual bias or an appearance of bias. *See Higganbotham v. Oklahoma ex rel. Okla. Transp. Comm'n*, 328 F.3d 638, 645 (10th Cir. 2003) ("It is, of course, an inescapable part of our system of government that judges are drawn primarily from lawyers who have participated in public and political affairs.") (internal quotation marks and citation omitted).

Additionally, the affidavit and exhibits submitted by Jackson indicate that Judge Starr answered, during the judicial confirmation process, that he would set aside his personal beliefs and apply binding precedent when asked about the legal treatment of LGBTQ individuals. His answers support the conclusion that he is committed to applying the law accordingly. Lastly, the judge's support of Mateer's judicial nomination does not amount to a support of Mateer's statements or beliefs. We cannot say that the district judge's decision not to recuse himself pursuant to 28 U.S.C. §§ 144 and 455(a) was an abuse of discretion.

### III. Motion to Dismiss

### A. Standard of Review

We review *de novo* a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Powers v. Northside Indep. Sch. Dist.*, 951 F.3d 298, 305 (5th Cir. 2020). "The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Id.* (citation omitted). A plaintiff must plead specific facts, not merely conclusory allegations to state a claim for relief that is facially plausible. *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The factual allegations need not be detailed, but they must be enough to raise a right to relief above the speculative level, assuming all the allegations are true." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).

### B. Legal Analysis

On appeal, Jackson argues that the district court erred in dismissing her § 1983 claims of municipal liability against Dallas County and Sheriffs Valdez and Brown in their official capacities.

To prevail against a municipality like Dallas County, a plaintiff must prove three elements: (1) Dallas County had a policy or custom, of which (2) a Dallas County policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is the policy or custom. *World Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 753 (5th Cir. 2009); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). To state a cognizable failure-to-train claim, a plaintiff must plead facts plausibly demonstrating that: (1) the municipality's training procedures were inadequate; (2) the municipality was deliberately indifferent in adopting its training policy; and (3) the inadequate training policy directly caused the constitutional violations in question. *World Wide*, 591 F.3d at 756.

Jackson articulates two theories of municipal liability: (1) a policy of strip searching transgender detainees for the sole purpose of determining the detainee's gender and classifying them solely on their biological sex, and (2) the failure to train and supervise employees to follow official policy prohibiting strip searches and the classification of transgender inmates solely on their sex assigned at birth. We address each theory in turn.

### i. Policy

A policy may be evidenced by "[a] policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority;" or "a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)). "A customary policy consists of actions that have occurred for so long and with such frequency

that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 169 (5th Cir. 2010). To plausibly plead a practice "so persistent and widespread as to practically have the force of law," a plaintiff must do more than describe the incident that gave rise to his injury. *Peña v. City of Rio Grande*, 879 F.3d 613, 622 (5th Cir. 2018) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). A pattern requires similarity and specificity, as well as "sufficiently numerous prior incidents" as opposed to "isolated instances." *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009) (quoting *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)). "[O]ccasional acts of untrained policemen are not otherwise attributed to city policy or custom." *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984).

Jackson alleged that she was forced to be examined in 2016 and was misclassified in 2016, 2017, and 2018; and that Dallas County officers forced another transgender female detainee named C.W. "to undress, spread her buttocks, show the bottom of her feet and then put on male jail attire" in 2013. Jackson also alleged that the officers stated to her: "Now our policy is we have to verify that you've had a sex change. If you have a penis, you're going with the men. If you have a vagina, you're going with the women," and "That's our policy. You can talk to Lupe Valdez about it when you get out." She was also told: "It's not uncommon for men that look like women to be sitting in the men's section and vice versa. You'll probably see some like you over there. You aren't the first and you won't be the last." When she asked to remain in a certain area to avoid potential harassment from male detainees, an officer denied the request: "No, you're going with the men because that's what you are. You're a man."

Because we must accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff, we conclude that Jackson

sufficiently pleaded a policy of strip searching transgender detainees for the sole purpose of determining their gender and classifying them solely on their biological sex. Specifically, her complaint alleged that she and another transgender female detainee were forced to endure two strip searches for determining their physical sex characteristics and four instances of being classified based on their anatomy. Further, alleged statements made by county employees support the reasonable inference that other transgender detainees have been treated similarly; for instance, officers told Jackson that it was their "policy" to classify detainees solely based on biological sex and that "[y]ou aren't the first and you won't be the last" transgender person to be placed with detainees of the same biological sex. In other words, the statements suggest that the way Jackson was treated is the norm rather than the exception.

While it is true that the complaint alleged fewer instances than we have typically held are sufficient to survive post-discovery stages of a *Monell* claim in other contexts, Jackson is only in the early stages of litigation without the benefit of discovery. *Cf. Peterson*, 588 F.3d at 851–52 & n.4 (holding that 27 incidents of excessive force in four years, "with no context as to the overall number of arrests or any comparisons to other cities" was insufficient to survive summary judgment on the custom theory). Further, we have affirmed the dismissal of *Monell* claims where the plaintiff had alleged only one or two incidents of unconstitutional conduct. *See, e.g.*, *Ratliff v. Aransas Cty.*, 948 F.3d 281, 285 (5th Cir. 2020) (affirming dismissal of *Monell* excessive-force claim where "the complaint's only specific facts appear in the section laying out the events that gave rise to this action"); *Culbertson v. Lykos*, 790 F.3d 608, 628 (5th Cir. 2015) (finding no allegation of a widespread practice of retaliation where the plaintiffs alleged "there was a retaliatory campaign against them" but "offered no evidence that similar retaliation had victimized others"); *Prince v. Curry*, 423 F. App'x 447, 451 (5th Cir. 2011)

(affirming dismissal of municipal liability claims where the alleged "existence of only one or, at most, two other similarly situated defendants" or "of one or two prior incidents" do not "plausibly suggest that [the county] has a policy or custom of unconstitutionally subjecting sex offenders to enhanced sentences").

Here, Jackson alleged that she and another transgender female detainee experienced multiple instances of strip searches and sex-based classifications. We also acknowledge Jackson's point that the population of transgender detainees is relatively small, so the number of similar incidents alleged or possibly discovered later in litigation will likely be less than those in other municipality liability cases. Thus, construing Jackson's allegations in a manner required for Rule 12(b)(6) motions, this is a close call that, at this stage of the proceeding, should have gone in Jackson's favor. Although her *Monell* claim "ultimately may not withstand a motion for summary judgment filed after discovery, or prevail at trial, neither scenario is determinative of this appeal." *Covington v. City of Madisonville*, 812 F. App'x 219, 228 (5th Cir. 2020) (reversing dismissal of § 1983 failure-to-supervise claim based on the officer's misconduct relative to plaintiff's false arrest). Accordingly, the district court erred in concluding that Jackson did not plead a policy of strip searches and sex-based classifications of transgender detainees.

Next, we address whether Jackson sufficiently pled that the policymaker of Dallas County had actual or constructive knowledge of the policy:

> Actual knowledge may be shown by such means as discussions at council meetings or receipt of written information. Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that

they were the subject of prolonged public discussion or of a high degree of publicity.

*Pineda*, 291 F.3d at 330. Jackson alleged that either Sheriffs Valdez or Brown served as policy maker for Dallas County "in relation to the policies, written and unwritten, regarding detainees held in the custody of the Dallas County Sheriff's Department and confined in the Dallas County jail." Appellees do not dispute the identity of the policymaker, but they argue that no knowledge of a policy can be imputed onto the sheriff. We disagree. The complaint plausibly pled that the sheriff had actual or constructive knowledge of a policy of strip searches and sex-based classifications of transgender detainees. In addition to the allegations regarding the frequency of these incidents and the officers' statements made to Jackson, Jackson alleged that she filed a formal complaint after her first arrest; a local newspaper contacted the sheriff's department about Jackson's treatment; and the department informed the newspaper of a pending investigation and that the intake video was pulled. These pleaded facts support the reasonable inference that the policymaker should have known or been aware of such incidents occurring in the jail. Accordingly, the district court also erred in concluding that Jackson failed to plead that the county policymaker had actual or constructive knowledge of a policy of strip searches and sex-based classifications of transgender detainees.

However, there is no district court ruling for us to review on whether a municipal policy requiring the treatment described in the complaint would violate the plaintiff's constitutional rights; that is, the third element of a municipal liability claim. Thus, we remand for further proceedings so that the district court may fully address the constitutionality of strip searching transgender detainees for the sole purpose of determining their gender and classifying them based solely on their biological sex.

No. 20-10344

## ii. Failure to Train or Supervise

When a municipal entity enacts a facially valid policy but fails to train its employees to implement it in a constitutional manner, that failure constitutes "official policy" that can support municipal liability if it "amounts to deliberate indifference." *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)). Thus, when a municipality's policymakers are on actual or constructive notice that a particular omission in their training program causes municipal employees to violate citizens' constitutional rights, the municipality may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id.*

Deliberate indifference may be proven in one of two ways. *Littell*, 894 F.3d at 624. First, "municipal employees will violate constitutional rights 'so often' that the factfinder can infer from the pattern of violations that 'the need for further training must have been plainly obvious to the . . . policymakers.'" *Id.* (quoting *Canton*, 489 U.S. at 390 n.10) (alteration in original). This proof-by-pattern method is "ordinarily necessary." *Id.* (quoting *Brown*, 520 U.S. at 409). Absent proof of pattern, deliberate indifference can still be inferred in a limited set of cases, where "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, [can] trigger municipal liability." *Brown*, 520 U.S. at 409 (citing *Canton*, 489 U.S. at 390). This "single-incident" exception applies when "the risk of constitutional violations was or should have been an 'obvious' or 'highly predictable

14

consequence' of the alleged training inadequacy." *Littell*, 894 F.3d at 624 (quoting *Brown*, 520 U.S. at 409).

Jackson attempts to establish deliberate indifference under the "pattern" theory, so we do not address the "single-incident" exception. *See Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 653 (5th Cir. 2004) ("Issues not raised or inadequately briefed on appeal are waived."). Again, we conclude that Jackson sufficiently pleaded facts that Dallas County employees conducted strip searches and classified transgender detainees solely on the basis of biological sex as to give rise to a widespread pattern. Further, Jackson's allegations that federal and county regulations prohibit searches of transgender detainees for the sole purpose of determining their genital status, yet employees conducted such searches regularly and called them county "policy," support the inference that Dallas County failed to adequately train its employees on how to process and screen transgender detainees in their jail facilities. Accordingly, the district court erred in concluding that Jackson failed to plead that the county's failure to train amounted to deliberate indifference.

But again, because there is no district court ruling for us to review on whether the county's failure to train its employees caused the violation of a constitutional right, we remand for further proceedings so that the district court may fully address the constitutionality of strip searching transgender detainees for the sole purpose of determining their gender and classifying them based solely on their biological sex.

## IV. Conclusion

For the foregoing reasons, we AFFIRM the denial of the motion to recuse, REVERSE the dismissal of the municipal liability claims against Dallas County and Valdez and Brown in their official capacities, and REMAND for further proceedings consistent with this opinion.