REVISED

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 18, 2021

Lyle W. Cayce
Clerk

No. 20-10344

Valerie Jackson,

*Plaintiff—Appellant*,

*versus*

Lupe Valdez; Marian Brown; Dallas County, Texas,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:18-CV-2935

Before Barksdale, Southwick, and Graves, *Circuit Judges*.
Per Curiam:*

    We withdraw our previous opinion, issued March 29, 2021, and issue this revised opinion in its place. Valerie Jackson is a transgender woman who sued Dallas County, Texas, and its employees for violating her constitutional rights related to her gender identity. Pursuant to Federal Rule of Procedure

---

\* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 20-10344

54(b), she appeals the district court's denial of her motion for recusal and the Rule 12(b)(6) dismissal of Dallas County and Sheriffs Lupe Valdez and Marian Brown in their official capacities. We AFFIRM.

## I. Background

Because this is an appeal from a Rule 12(b)(6) dismissal, the following are allegations from the operative complaint.

Valerie Jackson is a transgender woman. She was assigned the sex of male at birth and had her gender legally changed to female prior to the events alleged in the instant case.

On or about November 4, 2016, Jackson was arrested for unlawful possession of a weapon and taken to the Dallas County jail. During booking, an officer asked her standard intake questions and gave her a wristband identifying her gender as female. She was taken to an enclosed corner and ordered to lift her shirt and bra to expose her bare breasts, to which she complied. She was then escorted to a nurse.

The nurse asked Jackson medical questions that led her to reveal that she was a transgender woman. The nurse left the paperwork the way it was filled out and concluded the medical assessment. When Jackson returned to the waiting area with the other female detainees, an officer asked her in front of the other detainees if she had "a sex change or something" and whether she "had everything done even down there." She answered yes so that the humiliation would end.

Jackson was taken to the same enclosed corner and instructed to pull down her pants and underwear. When she asked why, an officer stated: "We need to know if you've had a sex change or not. We need to see if you have a penis or vagina. We have to protect you. We can't put you with men if you have a vagina." Jackson said she was not going to pull down her pants, and

the officer replied: "You are coming up in the system as male. It doesn't matter what you do, it can never be changed." Jackson stated again that she was not going to pull down her pants and that she should not have to prove anything to them if none of the other women had to prove anything. The officer continued: "Now our policy is we have to verify that you've had a sex change. If you have a penis, you're going with the men. If you have a vagina, you're going with the women."

Jackson continued to insist that she did not want to pull her pants down. An officer told her that if she refused, they would transfer her to Parkland Hospital where she would have to show her genitals, thus adding hours to her incarceration. An officer also said: "That's our policy. You can talk to [Sheriff] Lupe Valdez about it when you get out." The officer explained that the process could not move forward without Jackson revealing her genitals. Feeling she had no other choice, Jackson complied with the strip search.

After the search, Jackson was eventually placed in her own cell. She was then taken in a line with male inmates to court, and when she returned to the jail, she was taken to the male locker room and instructed to strip down and shower because "it was something everyone had to do." An officer intervened and took her to a holding cell, where Jackson received a new wristband that identified her gender as male. Jackson was moved multiple times while waiting for her paperwork to be processed, each time encountering new officers and inmates who misidentified her gender.

After being released from custody, Jackson filed a formal complaint regarding her treatment in the Dallas County jail. On November 7, 2016, Captain Shelley Knight with the Dallas County Sheriff's Office was contacted by a local newspaper regarding Jackson's treatment. Knight informed the newspaper that there was an investigation on the incident and

that the intake video from November 4, 2016, was pulled. She also informed the newspaper that she could see where some of the policy was misconstrued and other parts were not followed.

On April 19, 2017, Jackson was arrested for the second time and taken to the Dallas County jail, where she was classified male and held with the male inmates. She asked the officers to contact Knight, who could explain that Jackson should be classified and placed with female inmates, but they refused. She was later forced to shower with male inmates.

On June 15, 2018, Jackson was arrested for the third time and taken to the Dallas County jail, where she was again classified male and held with the male inmates. She was again forced to shower with male inmates.

In November 2018, Jackson sued Dallas County, Texas; former Sheriff Lupe Valdez and current Sheriff Marian Brown in their official and individual capacities; and Officer Lizyamma Samuel, Officer Samuel Joseph, and Unknown Dallas County Employee III in their individual capacities under 42 U.S.C. § 1983 for violations of her Fourth, Fifth, and Fourteenth Amendment rights.

In September 2019, the case was transferred to Judge Brantley Starr. Jackson moved for recusal under 28 U.S.C. §§ 144 and 455(a), arguing that Judge Starr held a bias against members of the LGBTQ community. The motion was denied. On motion, the district court later dismissed Dallas County and Valdez and Brown in their official capacities under Rule 12(b)(6). Jackson timely appealed.

## II. Motion to Recuse

## A. Standard of Review

We review the denial of a motion to recuse for abuse of discretion. *Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 483 (5th Cir. 2003).

No. 20-10344

## B. Legal Analysis

Jackson argues that the district court erred in denying her motion to recuse because of his personal bias against members of the LGBTQ community. Specifically, in an affidavit attached to the motion, Jackson averred that prior to his appointment to the federal bench, Judge Starr advocated against equal rights for members of the LGBTQ community as a Deputy Attorney General for the State of Texas by challenging federal guidance that directed schools to permit transgender students to use bathrooms that align with their gender identity; defending the right of county clerks to refuse to issue marriage licenses to same-sex couples; and testifying about state legislation that would protect adoption agencies that refuse to place children with same-sex couples. Further, Jackson stated that the judge "refused" to answer questions regarding the legal treatment of LGBTQ people during his judicial confirmation process, and that he supported the judicial nomination of Jeffrey Mateer, who, according to Jackson, allegedly said that "transgender children were part of "'Satan's plan.'"

Section 144 aims exclusively at actual bias or prejudice. *Patterson*, 335 F.3d at 483. It requires a judge to recuse if a party to the proceeding "makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party." 28 U.S.C. § 144. The affidavit must "state the facts and the reasons for the belief that bias or prejudice exists" and "shall be accompanied by a certificate of counsel of record stating that it is made in good faith." *Id.* The judge must pass on the sufficiency of the affidavit but may not pass on the truth of the affidavit's allegations. *Patterson*, 335 F.3d at 483. A legally sufficient affidavit must: (1) state material facts with particularity; (2) state facts that, if true, would convince a reasonable person that a bias exists; and (3) state facts that show the bias is personal, as opposed to judicial, in nature. *Id.*

No. 20-10344

Section 455(a) deals not only with actual bias and other forms of partiality, but also with the appearance of partiality. It requires a judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). A party seeking such disqualification "must show that, if a reasonable man knew of all the circumstances, he would harbor doubts about the judge's impartiality." *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d 1404, 1408 (5th Cir. 1994) (internal quotation marks and citations omitted). The objective standard relies on the "well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person." *Andrade v. Chojnacki*, 338 F.3d 448, 455 (5th Cir. 2003) (internal quotation marks and citation omitted). "The review of a recusal order under § 455(a) is 'extremely fact intensive and fact bound,' thus a close recitation of the factual basis for the [party's] recusal motion is necessary." *Republic of Panama v. Am. Tobacco Co.*, 217 F.3d 343, 346 (5th Cir. 2000) (citation omitted).

We agree with Jackson that the district court improperly addressed the truth of her affidavit under section 144. In reviewing a section 144 motion, the district court must only pass on the sufficiency of the affidavit and not its truth. *Patterson*, 335 F.3d at 483. The district court, however, expressly addressed the truth of Jackson's affidavit—claiming, *inter alia*, that Jackson "misconstrues the positions that this judge advocated on behalf of his client." It then evaluated, contested, and corrected each section of Jackson's affidavit. Instead, the district court should have stopped with this statement: "Instead of demonstrating personal bias, Jackson's allegations are merely against the positions Texas advanced in litigation and state 'no specific facts that would suggest that this judge would be anything but impartial in deciding the case before him.'"

We nevertheless conclude that the district court properly denied the recusal motion under both statutory provisions. Jackson did not state facts in

her affidavit showing that the judge harbored an actual bias against Jackson under section 144 nor did she demonstrate that the judge's impartiality might reasonably be questioned under section 455(a). Jackson cited to examples of the judge's past legal advocacy in the course and scope of his employment for the State of Texas, during which the judge made statements reflecting solely the legal positions of his client, not his personal views. A lawyer often takes legal positions on behalf of his client that he may or may not personally agree with, and the statements made by the district judge when he was a Deputy Attorney General only involved pertinent legal issues; that is, they were interpretations of statutes, caselaw, and administrative rules and reflected no personal animus against LGBTQ people.

If the instant case involved the judge's former employer or the same exact issue, recusal could be warranted. *See* 28 U.S.C. § 455(b)(3) (requiring recusal where a judge previously served in governmental employment and expressed an opinion concerning the merits of the particular case in controversy); *Panama*, 217 F.3d at 347 (holding that the judge's name listed on motion to file an amicus brief asserting allegations against tobacco companies similar to the ones made in the instant case against the defendant tobacco company may lead a reasonable person to doubt his impartiality). But the district judge's prior participation in high-profile cases involving a group of people with which Jackson identifies, without more, is insufficient to support a finding of actual bias or an appearance of bias. *See Higganbotham v. Oklahoma ex rel. Okla. Transp. Comm'n*, 328 F.3d 638, 645 (10th Cir. 2003) ("It is, of course, an inescapable part of our system of government that judges are drawn primarily from lawyers who have participated in public and political affairs.") (internal quotation marks and citation omitted).

Additionally, the affidavit and exhibits submitted by Jackson indicate that the district judge answered, during the judicial confirmation process, that he would set aside his personal beliefs and apply binding precedent when

No. 20-10344

asked about the legal treatment of LGBTQ individuals. His answers support the conclusion that he is committed to applying the law accordingly. Lastly, a judge's previous support for another judicial nominee does not amount to a support of that nominee's statements or beliefs. We cannot say that the district judge's decision not to recuse himself pursuant to 28 U.S.C. §§ 144 and 455(a) was an abuse of discretion.

### III. Motion to Dismiss

### A. Standard of Review

We review *de novo* a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Powers v. Northside Indep. Sch. Dist.*, 951 F.3d 298, 305 (5th Cir. 2020). "The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Id.* (citation omitted). A plaintiff must plead specific facts, not merely conclusory allegations to state a claim for relief that is facially plausible. *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The factual allegations need not be detailed, but they must be enough to raise a right to relief above the speculative level, assuming all the allegations are true." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).

### B. Legal Analysis

On appeal, Jackson argues that the district court erred in dismissing her § 1983 claims of municipal liability against Dallas County and Sheriffs Valdez and Brown in their official capacities.

To prevail against a municipality like Dallas County, a plaintiff must prove three elements: (1) Dallas County had a policy or custom, of which (2) a Dallas County policymaker can be charged with actual or constructive

8

knowledge, and (3) a constitutional violation whose "moving force" is the policy or custom. *World Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 753 (5th Cir. 2009); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). To state a cognizable failure-to-train claim, a plaintiff must plead facts plausibly demonstrating that: (1) the municipality's training procedures were inadequate; (2) the municipality was deliberately indifferent in adopting its training policy; and (3) the inadequate training policy directly caused the constitutional violations in question. *World Wide*, 591 F.3d at 756.

Jackson articulates two theories of municipal liability: (1) a policy of strip searching transgender detainees for the sole purpose of determining the detainee's gender and classifying them solely on their biological sex, and (2) the failure to train and supervise employees to follow official policy prohibiting strip searches and the classification of transgender inmates solely on their sex assigned at birth. We address each theory in turn.

### i. Policy

A policy may be evidenced by "[a] policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority;" or "a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)). "A customary policy consists of actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 169 (5th Cir. 2010). To plausibly plead a practice "so persistent and

widespread as to practically have the force of law," a plaintiff must do more than describe the incident that gave rise to his injury. *Peña v. City of Rio Grande*, 879 F.3d 613, 622 (5th Cir. 2018) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). A pattern requires similarity and specificity, as well as "sufficiently numerous prior incidents" as opposed to "isolated instances." *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009) (quoting *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)). "[O]ccasional acts of untrained policemen are not otherwise attributed to city policy or custom." *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984).

Jackson alleged that she was forced to be examined in 2016 and was misclassified in 2016, 2017, and 2018; and that Dallas County officers forced another transgender female detainee named C.W. "to undress, spread her buttocks, show the bottom of her feet and then put on male jail attire" in 2013. Jackson also alleged that the officers stated to her: "Now our policy is we have to verify that you've had a sex change. If you have a penis, you're going with the men. If you have a vagina, you're going with the women," and "That's our policy. You can talk to Lupe Valdez about it when you get out."

We recognize that Jackson is without the benefit of discovery, and that we have no rigid rule regarding numerosity to prove a widespread pattern of unconstitutional acts. Though it is a close call, for a Rule 12(b)(6) dismissal, we cannot conclude that allegations of two incidents of strip searches and four incidents of sex-based classifications of two transgender people in a span of five years support the reasonable inference that a practice of strip searches and classifications of transgender detainees solely on their biological sex is "so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61; *see Prince v. Curry*, 423 F. App'x 447, 451 (5th Cir. 2011) (affirming dismissal of municipal liability claims where the alleged "existence of only one or, at most, two other similarly situated defendants"

No. 20-10344

or "of one or two prior incidents" do not "plausibly suggest that [defendant county] has a policy or custom of unconstitutionally subjecting sex offenders to enhanced sentences"). Such isolated violations "are not the persistent, often repeated, constant violations that constitute custom and policy." *Bennett*, 729 F.2d at 768 n.3. We conclude that the district court properly dismissed Jackson's municipal liability claim based upon her "policy" theory.

### ii. Failure to Train or Supervise

When a municipal entity enacts a facially valid policy but fails to train its employees to implement it in a constitutional manner, that failure constitutes "official policy" that can support municipal liability if it "amounts to deliberate indifference." *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)). Thus, when a municipality's policymakers are on actual or constructive notice that a particular omission in their training program causes municipal employees to violate citizens' constitutional rights, the municipality may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id.*

Deliberate indifference may be proven in one of two ways. *Littell*, 894 F.3d at 624. First, "municipal employees will violate constitutional rights 'so often' that the factfinder can infer from the pattern of violations that 'the need for further training must have been plainly obvious to the . . . policymakers.'" *Id.* (quoting *Canton*, 489 U.S. at 390 n.10) (alteration in original). This proof-by-pattern method is "ordinarily necessary." *Id.* (quoting *Brown*, 520 U.S. at 409). Absent proof of pattern, deliberate

No. 20-10344

indifference can still be inferred in a limited set of cases, where "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, [can] trigger municipal liability." *Brown*, 520 U.S. at 409 (citing *Canton*, 489 U.S. at 390). This "single-incident" exception applies when "the risk of constitutional violations was or should have been an 'obvious' or 'highly predictable consequence' of the alleged training inadequacy." *Littell*, 894 F.3d at 624 (quoting *Brown*, 520 U.S. at 409).

Jackson attempts to establish deliberate indifference under the "pattern" theory, so we do not address the "single-incident" exception. *See Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 653 (5th Cir. 2004) ("Issues not raised or inadequately briefed on appeal are waived."). Again, it cannot be said that Jackson sufficiently pleaded facts that Dallas County employees conducted strip searches and classified transgender detainees solely on the basis of biological sex "so often" as to give rise to a pattern. And without such a pattern, the need for training could not have been "plainly obvious" to Dallas County or its policymakers. Accordingly, the district court did not err in dismissing Jackson's municipal liability claim based on its purported failure to supervise or train.

## IV. Conclusion

For the foregoing reasons, we AFFIRM the denial of the motion to recuse and the dismissal of Dallas County and Valdez and Brown in their official capacities.

12

No. 20-10344

Leslie H. Southwick, *Circuit Judge*, dissenting in part.

I agree with the majority's holding and reasoning on the question of recusal. On the merits, my only disagreement is that we should not affirm dismissal of the municipal-policy claim. I will explain.

To begin, a point about an issue that neither of today's opinions resolves. There was no district court ruling for us to review on whether a municipal policy mandating the jail intake procedures described in the complaint would violate the plaintiff's constitutional rights. Jackson argued that the policy violated her Fourth Amendment rights against unreasonable searches and seizures as well as her substantive-due-process and equal-protection rights. Dallas County did not brief the constitutionality of any policy but, like the district court, focused instead on the failure to allege a policy. Searches of inmates must be conducted in a reasonable manner, *see, e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 560 (1979), but the law on Jackson's due-process and equal-protection claims is less settled. Jackson relies on cases about abortion and conscience-shocking actions by officials for support. *E.g.*, *Planned Parenthood of S.E. Penn. v. Casey*, 505 U.S. 833 (1992); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998). She also cites to regulations under the Prison Rape Elimination Act that prohibit physical examinations of transgender inmates for the purpose of determining genital status. 28 C.F.R. § 115.15(e). I will explain my conclusion that the complaint sufficiently asserts the existence of a municipal policy, but I would remand for the district court to determine initially whether the policy violates Jackson's constitutional rights. I assert no opinion on that question today.

This appeal comes from the grant of a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6). Though in part repeating what the majority opinion already has accurately stated, I discuss the pleading standard that is required to survive a motion to dismiss. We use the same

words for the pleading standard, but I interpret their application differently than does the majority.

We give *de novo* review to motions to dismiss for failure to state a claim. *Powers v. Northside Indep. Sch. Dist.*, 951 F.3d 298, 305 (5th Cir. 2020). That means we accept the plaintiff's plausibly pled facts as true and view them in the light most favorable to her. *Id.* The complaint does not need to provide "detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Factual allegations are assumed to be true "even if doubtful in fact"; still, they must be enough to raise a right to relief above the "speculative level." *Id.* The facts must state a claim "that is plausible on its face," but need not rise to the level of being probable. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Even where "recovery seems 'very remote and unlikely,'" a complaint may survive a motion to dismiss. *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 726 (5th Cir. 2018) (quoting *Twombly*, 550 U.S. at 555–56).

As the majority in this appeal states, a *Monell* claim requires proof of (1) a policymaker, (2) an official policy, (3) and "a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978)). There are two ways to prove a policy. One is to show that a policy has been "formally announced by an official policymaker." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 168 (5th Cir. 2010). The other is to prove "[a] persistent, widespread practice of [county] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a

custom that fairly represents municipal policy." *Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984) (*en banc*).

The majority concludes that Jackson has failed to allege enough incidents to prove a policy through the existence of a custom. In my understanding, a plaintiff is not required pre-discovery to distinguish between a formal policy and a custom. The evidence creating a plausible claim of a policy before a suit is filed may not create clarity about the form in which the policy is expressed. We know that a complaint's assertion of a customary policy can take the form of claiming a pattern of unconstitutional conduct by municipal actors or claiming a policymaker's single unconstitutional action. *Zarnow*, 614 F.3d at 169. Thus, even if no relevant, formal policy exists, a plaintiff may offer evidence "demonstrat[ing] the governing body's knowledge and acceptance of the disputed conduct." *Id.* Municipal liability "attaches where — and only where — a deliberate choice to follow a course of action is made from among various alternatives by the official . . . responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). An "'official policy' often refers to formal rules or understandings — often but not always committed to writing." *Id.* at 480.

In my view of the complaint, Jackson has sufficiently pled a policy that may ultimately be proven under either theory. Some of the details are as follows. The complaint alleges that during intake at the jail, Jackson was given a wristband identifying her as a woman. She then was strip searched for the purpose of determining her genitalia to assure proper placement. To support her allegation that this was county policy, she alleges that a Dallas County employee, while instructing her to pull down her pants, stated: "[O]ur policy is we have to verify that you've had a sex change. If you have a penis you're going with the men. If you have a vagina you're going with the women." Further: "[T]hat's our policy. You can talk to [Sheriff] Lupe

Valdez about it when you get out." That same officer told her, "It's not uncommon for men that look like women to be sitting in the men's section and vice versa. You'll probably see some like you over there. You aren't the first and you won't be the last." After the search, she was placed with the men. An officer told her, "[Y]ou're going with the men because that's what you are. You're a man."

Jackson's complaint sufficiently alleged a policy that existed in some form, as yet unknown. Counsel for Jackson restated the point in oral argument before this court:

> You can show a policy either by a written policy or you can show it by a custom and practice, and here we have an actual statement from the individuals who were tasked with enforcing this practice, this custom, and this unwritten policy, and actually attributing it to the policymaker, Lupe Valdez, who was the Dallas Sheriff. So, this is not simply a situation where we need to show a pattern of abuse, we actually have a statement of the policy that genital searches were required to determine the biological sex of detainees.

Dallas County employees told Jackson that they had a policy. She must plead facts that plausibly allege that the policy existed. Jackson did. After discovery, her allegations about the policy her jailers were referencing may become clearer, or, instead, discovery may reveal there is no policy in any form.

It is too early at this stage to conclude that she cannot show a policy simply because she has not yet discovered enough incidents. Jackson's complaint alleged four instances of placing transgender detainees based on their anatomy and two strip searches for determining physical sex characteristics. As the majority correctly states, "we have no rigid rule regarding numerosity to prove a widespread pattern of unconstitutional acts." The complaint also quotes jail personnel as saying, "It's not

No. 20-10344

uncommon for men that look like women to be sitting in the men's section and vice versa. You'll probably see some like you over there. You aren't the first and you won't be the last," implying that Jackson was part of a larger and continuing collection of people subjected to this treatment. In other words, the quoted statement supports that the way Jackson was treated was the norm rather than the exception.

In my view, Jackson has plausibly pled facts which, if true, support the existence of a county policy. *See Iqbal*, 556 U.S. at 678. Whether it exists as an official policy "formally announced by an official policymaker," *see Zarnow*, 614 F.3d at 168, or a persistent, widespread custom "so common and well settled as to constitute a custom that fairly represents municipal policy," *see Webster*, 735 F.2d at 841, is irrelevant at this stage. I would not charge Jackson with knowing what form the policy takes until she has had a chance to discover it. Respectfully, I dissent.